ENTREPRENEUR MEDIA, INC.,
A California Corporation,
Plaintiff–Appellee,

v.

Scott SMITH, an Individual dba
Entrepreneurpr, Defendant–
Appellant.

No. 00–56559.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 2001.

Filed Feb. 11, 2002.

Jeffrey S. Kravitz, Sacramento, CA, for the defendant-appellant.

Mark A. Finkelstein, Latham & Watkins, Costa Mesa, CA, for the plaintiff-appellee.

Before BFLETCHER, T.G. NELSON, and BERZON, Circuit Judges.

BERZON, Circuit Judge.

Entrepreneur Media, Inc. ("EMI"), publisher of Entrepreneur magazine, contends that Scott Smith infringed EMI's federally registered trademark "ENTREPRENEUR" by using the word "entrepreneur" in connection with his public relations company. The district court, Cooper J., granted summary judgment in favor of EMI on its trademark infringement claims, and Smith appeals. We affirm in part, reverse in part, and remand for a trial on the merits.

## I. BACKGROUND

### A. Entrepreneur Media, Inc.

Since 1978, the appellee EMI has published *Entrepreneur* magazine, a monthly publication geared towards small businesses and their owners. *Entrepreneur* has a paid circulation of approximately 540,000 and sells for $3.95 on newsstands. Advertisements in *Entrepreneur* cost the advertiser from $12,000 to just over $60,000 per issue. EMI also publishes other magazines, books, computer software, and audio and video tapes, and participates in trade shows and seminars, all in connection with the world of small business.

EMI has a Web site with the domain names "entrepreneur.com" and "entrepreneurmag.com." On the Web site, visitors can view on-line versions of *Entrepreneur* magazine, subscribe to the publication, interact with other visitors, and learn about business opportunities. EMI uses the Web site for marketing and advertising, and also advertises on radio, on television, and in print. Additionally, EMI promotes small business events and sends complimentary copies of its magazine to other members of the media.

In 1987, EMI registered the term "ENTREPRENEUR" as a trademark on the federal Principal Register in International Class 16 for "paper goods and printed

matter; namely magazines, books and published reports pertaining to business opportunities" and in International Class 9 for "computer programs and programs/user manuals all sold as a unit." The mark has attained incontestable status for the paper good and computer program categories.[1] In 1995, EMI registered the term "ENTREPRENEUR" as a service mark for trade show exhibitions, seminars, and workshops. EMI has also registered various other marks, including: "ENTREPRENEUR EXPO," "ENTREPRENEUR INTERNATIONAL," "ENTREPRENEURIAL WOMAN," and "EntrepreneurMag.com."

## B. Scott Smith d/b/a EntrepreneurPR

In 1995, the appellant Smith started a public relations company for small businesses called ICON Publications. ICON produced a publication entitled *Yearbook of Small Business Icons*, containing copyright-free articles about ICON's clients, and distributed the *Yearbook* free of charge to various media contacts, with the goal of increasing the clients' media coverage. ICON also operated a Web site, at iconpub.com.

When Smith decided to publish the *Yearbook* on a quarterly rather than yearly basis he also decided that name changes were in order. Smith hired a name-consultation firm, had a trademark search performed, and, in 1997, settled on "EntrepreneurPR" as the new name for his company, *Entrepreneur Illustrated* as the new name for the *Yearbook,* and entrepreneurpr.com as his new Web site address.

EntrepreneurPR's clients pay $10,000 per year for inclusion in *Entrepreneur Illustrated,* distributed to approximately 3,800 media representatives free of charge. *Entrepreneur Illustrated* does not otherwise accept paid advertisements.

## C. Procedural History

EMI filed this case in 1998, alleging trademark infringement, unfair competition, and counterfeiting under the Lanham Act, 15 U.S.C. § 1125, and unfair competition under the California Business and Professions Code § 17200. Both parties moved for summary judgment. The district court granted EMI's motion on the trademark infringement and unfair competition claims, denied EMI's motion on the counterfeiting claim, and denied Smith's motion in its entirety. EMI thereupon dismissed its claim for counterfeiting. After supplemental briefing, the court, on August 29, 2000, awarded EMI $337,280 in damages and enjoined Smith from using any marks confusingly similar to "Entrepreneur," including the terms "Entrepreneur," "EntrepreneurPR," "Entrepreneur Illustrated," and "Entrepreneur.com" [sic].

Smith filed a timely Notice of Appeal on September 11, 2000. On October 23, 2000, this court denied Smith's emergency motion to stay the judgment pending appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

## A. Standard of Review

■■■ This court reviews the district court's grant of summary judgment de

---

1. A mark attains incontestable status in a category if the registrant continuously uses the mark for five consecutive years after registering it in that category and certain other requirements have been met. This status gives EMI the exclusive right to use the mark on or in connection with that category. 15 U.S.C. §§ 1115(b), 1065.

Thus, if Smith used in one of the protected categories a mark identical to EMI's, he would necessarily infringe EMI's trademark. Smith, however, uses marks that incorporate, but nonetheless differ from, EMI's mark. Incontestability therefore does not resolve the infringement issue, and we must decide if the trademark protection to which EMI is entitled encompasses the marks Smith uses.

novo. *See Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 184 F.3d 1107, 1109 (9th Cir.1999). We must determine whether, "viewing the evidence in the light most favorable to the nonmoving party, ... there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law." *Wendt v. Host International, Inc.,* 125 F.3d 806, 809–10 (9th Cir.1997). "Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Interstellar,* 184 F.3d at 1109 (citing *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1356 n. 5 (9th Cir.1985)).

## B. The Trademark Infringement Claim

■ "The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). To achieve these goals, the Act allows for civil liability against "[a]ny person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ..., which (A) is *likely to cause confusion ... as to the origin,* sponsorship, or approval" of the goods or services. 15 U.S.C. § 1125(a)(1) (emphasis added).

■ The only element of EMI's trademark infringement claim in dispute is whether Smith's use of the terms "EntrepreneurPR," "*Entrepreneur Illustrated,*" and "entrepreneurpr.com" are "likely to cause confusion" as to their "origin, sponsorship, or approval." *Id.* "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998).

■ In *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), this court developed an eight-factor test "intended to guide the court in assessing the basic question of likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992). The *Sleekcraft* factors, as applied to this case, are:

1. The strength of EMI's trademark;
2. The similarity of the marks;
3. The proximity or relatedness of the goods or services;
4. Smith's intent in selecting the marks;
5. Evidence of actual confusion;
6. The marketing channels used;
7. The likelihood of expansion of product lines; and,
8. The degree of care consumers are likely to exercise.

*Sleekcraft,* 599 F.2d at 348–49. The ultimate question of likelihood of confusion "is predominantly factual in nature," as is each factor within the *Sleekcraft* likelihood of confusion test. *Wendt,* 125 F.3d at 812.

■ Although the *Sleekcraft* test plays an important role in the analysis of whether a likelihood of confusion exists, "[i]t is the totality of facts in a given case that is dispositive." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). After applying the *Sleekcraft* analysis, we agree with the district court's ultimate finding of likelihood of confusion as a matter of law only as to the use of the mark "*Entrepreneur Illustrated*" on the cover of EntrepreneurPR's printed publication. We therefore reverse the grant of summary judgment and remand except as to that issue; we affirm the grant of summary judgment on the question whether Smith infringed EMI's trademark by his

use of the mark *"Entrepreneur Illustrated "* on the cover of that publication.

### 1. Overview of the Sleekcraft Analysis

■ The *Sleekcraft* factors are, as *E. & J. Gallo* says, a "guide" to decision-making, intended to channel the analytical process but not dictate any result. 967 F.2d at 1290. Since each factor represents only a facet of the single dispositive issue of likely confusion, the factors, not surprisingly, tend to overlap and interact, and the resolution of one factor will likely influence the outcome and relative importance of other factors. For instance, as this case demonstrates, if the trademark holder's mark is weak, "only if the marks are quite similar, and the goods closely related, will infringement be found." *Sleekcraft,* 599 F.2d at 350.

Thus, we do not decide whether confusion is likely by considering mechanically the number of *Sleekcraft* factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999). To do so would be entirely misleading, as the determination of one factor is often, in essence, only another way of viewing the same considerations already taken into account in finding the presence or absence of another one. Rather, as we apply the *Sleekcraft* test, we consider what each factor, and—more importantly—what the analysis as a whole, reveals about the ultimate question before us: the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark.

### 2. Application of the Eight Factors

#### a. The Strength of EMI's Mark

■ The scope of the trademark protection that we give marks depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones. *See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448 (9th Cir.1988). This is so because a strong mark is "inherently distinctive," *Sleekcraft,* 599 F.2d at 349, and therefore it is more likely that consumers will be confused by another's use of the same or similar mark. Since we conclude on this record that EMI's mark is weak, this factor does not weigh in favor of a likelihood of consumer confusion.

■ "The strength of a mark is determined by its placement on a continuum of marks." *E. & J. Gallo,* 967 F.2d at 1291 (citation and internal quotation marks omitted). The strongest marks—that is, those which receive the maximum trademark protection—are "arbitrary" or "fanciful." *Id.* The weakest marks, entitled to no trademark protection, are "generic." *Id.* In between lie "suggestive" and "descriptive" marks; suggestive marks have the greater strength of the two. *Id.* The issue here is whether EMI's mark "ENTREPRENEUR" falls within the suggestive or descriptive category.[2]

■ "Descriptive marks define qualities or characteristics of a product in

---

**2.** A fanciful mark is "a coined word or phrase, such as Kodak, invented solely to function as a trademark." *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1390 (9th Cir.1993). An arbitrary mark is a common word that is "non-descriptive of any quality of the goods or services." *Id.* "Generic marks give the general name of the product; they embrace an entire class of products." *Ken-*

dall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998) (emphasis omitted).

"ENTREPRENEUR" is descriptive of a quality of EMI's magazine, and it is not a coined word. Thus, EMI's mark is not arbitrary or fanciful. *See Official Airline Guides,* 6 F.3d at 1390. At the other end of the spectrum, "ENTREPRENEUR" does not state

a straightforward way that requires no exercise of the imagination to be understood." *Kendall–Jackson Winery*, 150 F.3d at 1047 n. 8 (emphasis omitted); *see also Brookfield*, 174 F.3d at 1058 n. 19 ("Descriptive terms directly describe the quality or features of the product."). A suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, ... the mark does not *describe* the product's features, but *suggests* them." *Kendall–Jackson Winery*, 150 F.3d at 1047 n. 8

Whether a mark suggests or describes the goods or services of the trademark holder depends, of course, upon what those goods or services are. We therefore adjudge a mark's strength "by reference to the goods or services that it identifies," *Rodeo Collection*, 812 F.2d at 1218, and "as it appears in the marketplace." *Official Airline Guides*, 6 F.3d at 1392.

On the record before us, it is apparent that the mark "ENTREPRENEUR" as applied to EMI's magazine and to computer programs and manuals falls within the descriptive category.[3] The

word "entrepreneur" describes both the subject matter and the intended audience of the magazine and programs; an entirely unimaginative, literal-minded person would understand the significance of the reference. As such, the word "describes the qualities or characteristics" of EMI's products, and is not merely suggestive. *Park 'N Fly*, 469 U.S. at 194, 105 S.Ct. 658; *Kendall–Jackson Winery*, 150 F.3d at 1047 n. 8; *see also McGraw–Hill Publ'g Co. v. American Aviation Assocs.*, 117 F.2d 293, 295 (D.C.Cir.1940) (discussing the magazine *"Aviation"*: "It is difficult to conceive of a term that would be more descriptive of the contents of the plaintiff's magazine. The plaintiff suggests that a descriptive word designates some physical characteristic. But that magazines may be described by their subject matter is too clear to be doubted.") (citations omitted); *Scholastic, Inc. v. Macmillan, Inc.*, 650 F.Supp. 866, 871 (S.D.N.Y.1987) ("The Court finds that 'Classroom' is no more than a descriptive trademark.... A consumer of ordinary intelligence would immediately and inevitably conclude that a magazine called 'Classroom' dealt with the instruction of students.").[4]

the general name of EMI's product—a magazine—and therefore does not fit within the generic category. *See Kendall–Jackson Winery*, 150 F.3d at 1047 n. 8. *But see CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir.1975) (holding that "Consumer Electronics," as the name of a magazine in that industry, is generic).

**3.** A descriptive mark is entitled to trademark protection only if "it has acquired secondary meaning, *i.e.*, it 'has become distinctive of the applicant's goods in commerce.' " *Park 'N Fly*, 469 U.S. at 194, 105 S.Ct. 658 (quoting 15 U.S.C. §§ 1052(e), (f)). Suggestive marks, on the other hand, receive trademark protection without proof of secondary meaning. *Sleekcraft*, 599 F.2d at 349. Thus, whether a mark is descriptive or suggestive can be a hotly disputed issue.

The distinction has little relevance here, however, because the incontestable status of

EMI's mark serves as conclusive proof that the mark has secondary meaning. *Park 'N Fly*, 469 U.S. at 205, 105 S.Ct. 658. Smith cannot, therefore, defend on the ground that EMI's mark is descriptive and *without* secondary meaning, and thus entitled to no trademark protection at all.

We note that, although determining whether EMI's mark is descriptive or suggestive does not affect whether EMI must prove secondary meaning, the relative strength or weakness of EMI's mark does affect whether a consumer would likely be confused by the marks Smith uses. Moreover, the incontestable status of EMI's mark does *not* require a finding that the mark is strong. *Miss World*, 856 F.2d at 1449.

**4.** Our analysis is in accord with numerous other court decisions; the following magazine titles have also been found descriptive: "Science," "Alaska," "Sport," "Time," "Travel,"

The need of others in the marketplace to use the term "entrepreneur" to describe their goods or services confirms that EMI's mark is descriptive. *See Rodeo Collection*, 812 F.2d at 1218. We note initially that if there are numerous synonyms for a common trademarked word, others will have less need to use the trademarked term. We are not aware of, nor has EMI suggested, any synonym for the word "entrepreneur."[5] Furthermore, "although English is a language rich in imagery, we need not belabor the point that some words, phrases or symbols better convey their intended meanings than others." *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir.1992). In other words, while Smith could have used a phrase such as "Small Business Innovator Illustrated," he would have lost both nuance and economy of language by doing so.

■ Widespread *use* of a word by others may serve as confirmation of the *need* to use that word. *See Sleekcraft*, 599 F.2d at 349 (commenting on the lack of evidence that "others have used or desire to use

Slickcraft [the trademarked word] in describing their goods"); *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 834 (9th Cir.1991) (Kozinski, J., dissenting) (listing the number of times the trademarked words occurred in various phone books as evidence of the mark's weakness). Smith's expert identified at least six other magazines in which the word "entrepreneur" makes up part of the title.[6] Numerous companies have registered marks that include the word "entrepreneur."[7] Over one thousand Web site domain names contain the word "entrepreneur." Smith's expert also provided extensive evidence of the frequent use of the word "entrepreneur" as a common noun.[8]

Although the incontestable status of EMI's trademark "ENTREPRENEUR" gives EMI the exclusive right to use *its trademark* in printed publications pertaining to business opportunities, the common and necessary uses of the word "entrepreneur" provide strong evidence that EMI cannot have the exclusive right to use the *word* "entrepreneur" *in* any mark identifying a printed publication addressing sub-

"Parent," "College Humor," and "Photoplay." *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993); *Photoplay Publ'g Co. v. Laverne Publ'g Co.*, 269 F. 730 (3d Cir.1921); *American Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244, 255–56 (D.D.C.1980) (citing cases); *Collegiate World Publ'g Co. v. du Pont Publ'g Co.*, 14 F.2d 158 (N.D.Ill.1926), aff'd. 25 F.2d 1018 (7th Cir.1928).

5. The district court and the parties define "entrepreneur" as a "small, independent business owner." The Oxford English Dictionary defines "entrepreneur," in its most relevant sense, as "one who undertakes an enterprise; one who owns and manages a business; a person who takes the risk of profit or loss." *The Compact Oxford English Dictionary* 522 (2d ed. 1991) (hereinafter "OED").

6. They are: *Hispanic Entrepreneur, Hong Kong Entrepreneur, Minority Business Entre-*

*preneur, High Tech Entrepreneur, The Skinflint Entrepreneur,* and *Big Farmer Entrepreneur.*

7. The following marks are listed on the federal register in the same class (Class 16) as *Entrepreneur* magazine: "Entrepreneur's Alert" registered by Amerilawyer, Chartered; "Entrepreneur's Notebook," registered by The Chamber of Commerce of the United States; "American Entrepreneurs Association" and "Entrepreneur Insiders Newsletter," registered by Chase Revel, Inc.; "Entrepreneurs Advantage Resource Network," registered by Dorothy M. Conrad; "The Entrepreneur's Program," registered by The Hume Group, Inc.; "The Anonymous Entrepreneur," registered by Chad J. Simmons.

8. For instance, in 180 days of *The Sacramento Bee*, the word "entrepreneur" occurred in more articles than did the words "juror" and "banker."

jects related to entrepreneurship. Moreover, that the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused by its use. "The fact that the term … resides in the public domain lessens the possibility that a purchaser would be confused and think the mark came from a particular single source." *Gruner + Jahr*, 991 F.2d at 1078 (internal citation omitted); *see also Miss World*, 856 F.2d at 1449 (discussing a "crowded field of marks" and stating: "In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.") (citation and internal quotation marks omitted).

We recognize, however, that "[a]lthough a suggestive or descriptive mark … is inherently a weak mark, it 'may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition….'" *American Int'l Group*, 926 F.2d at 832 (quoting *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir.1989)). The record indicates that EMI has used the trademark ENTREPRENEUR to identify its magazine since 1978 and that EMI sells more than a half million copies of *Entrepreneur* magazine monthly, with the total number of readers over two million monthly.

Nonetheless, EMI has not demonstrated that it has so strengthened its mark as to weigh this factor in favor of finding likely confusion. At trial, EMI will have the opportunity to prove that its mark is stronger than it currently appears. For present purposes—that is, for assessing whether EMI was entitled to summary judgment as to the likelihood of confusion—we credit the "ENTREPRENEUR" mark with only descriptive strength, because on this record EMI has demonstrated no more.

### b. *Similarity of the Marks*

■ "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir.2000). We have developed three axioms that apply to the "similarity" analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences. *Id.* We consider in turn Smith's three allegedly infringing marks according to these principles:

### 1. The Title of Smith's Publication: *Entrepreneur Illustrated*

EMI and Smith print on the covers of their publications the words "Entrepreneur" and "Entrepreneur Illustrated," respectively. Colors and font styles of the titles of the two publications differ. Smith uses font sizes, however, that lessen the effect of the name differences: "Illustrated" appears on his publication in a much smaller (one-half, perhaps) font size than does "Entrepreneur." *See Miss World*, 856 F.2d at 1451 ("Mrs. World" and "Mrs. of the World" "appear somewhat similar because 'Mrs. of the World' is designed on letterhead and promotional material in a manner that deemphasizes the 'of the' in the title."). Moreover, the artwork on two of Smith's covers included in the record obstructs much of the word "Illustrated." Smith's font size and obstructing artwork thus obfuscate the difference in the names of the publications, so that, as the district court concluded, "the word ENTREPRENEUR is the most prominent visual feature of both publications' covers," and consumers are likely to notice only the word

"Entrepreneur" on the cover of Smith's publication. Furthermore, although *"Entrepreneur Illustrated"* is not a typical magazine, Smith's publication does *look* like a typical magazine, which lends visual similarity to the marks as they appear in the marketplace. For all these reasons, Smith's use of the mark "Entrepreneur Illustrated" on his publication's cover is similar to EMI's use of its trademark, and the district court correctly weighed this factor—as to this use—in favor of likely confusion. *See Hearst,* 498 F.Supp. at 247 (finding that "publishing Science Digest with the word 'Science' given overwhelming prominence" infringes *Science* magazine's mark).

The terms "Entrepreneur" and "Entrepreneur Illustrated" are, of course, used in the marketplace in contexts other than the publication covers. *See Dreamwerks,* 142 F.3d at 1131 (considering the fact that a mark sometimes appears without a logo); *Sleekcraft,* 599 F.2d at 351 (same). Both parties, for example, refer to their respective publication titles in textual sentences on their web sites. In this type of use, both marks presumably appear in black, and font type and size simply match the rest of the text.

A reasonable juror could, in this context, find "Entrepreneur" and "Entrepreneur Illustrated" dissimilar. "Entrepreneur Illustrated" contains an entire four-syllable word that "Entrepreneur" does not; this difference between the marks is a noticea-

ble one,[9] because it makes the mark "Entrepreneur Illustrated" almost twice as long—to the eye and the ear—as the mark "Entrepreneur."[10] *See Gruner + Jahr,* 991 F.2d at 1078 (affirming the district court's ruling that the magazine title "Parent's Digest" was not similar to the magazine title "Parents" and noting that "the only similarity concerned the use of the word 'parent' "); *McGraw Hill Publ'g,* 117 F.2d at 295 (finding confusion not probable between "American Aviation" and "Aviation" and relying in part on the fact that "American Aviation" "is composed of two words").

Thus, in what is perhaps the most obvious context—the appearance of the marks on the parties' publication covers included in the record—a reasonable juror would have to find the marks similar. However, when used in other contexts—in speech and in plain text (in which the font size of "Entrepreneur" and "Illustrated" are the same, and neither word is obstructed by artwork)—a fact finder could reasonably conclude that the marks are dissimilar, because of the noticeable differences between them.

### 2. The Name of Smith's Business: EntrepreneurPR

At first glance, the difference between the two words, "Entrepreneur" and "EntrepreneurPR," may seem slight. We be-

---

**9.** Because the result of the consideration of one factor can influence the consideration of another, if the trademark holder's mark were strong, the fact that a consumer would likely notice the difference between two marks might not suffice for a finding that the marks are dissimilar. For instance, if the alleged infringer used the mark "Coca–Cola Light," a consumer would presumably notice the addition of the word "Light," but the fact that the similarity involves the use of a much stronger mark would make that similarity weigh more heavily in the analysis of this factor. In this

case, the similarity involves only the use of a common, descriptive word in the English language, making the difference between the marks more important.

**10.** We note that "Illustrated" means "having pictorial illustrations." *OED* 815. In the context of two printed publications, we do not believe the addition of "Illustrated" significantly alters the meaning of the term "Entrepreneur." So as to *meaning,* a reasonable juror could only find the terms similar.

lieve a reasonable juror could, however, find them dissimilar.

The addition of the letters "PR" to the end of the word "Entrepreneur" does not, it is true, create as great a visual difference between the parties' marks as does the addition of the word "Illustrated." But, as Smith's expert testified, in judging the likely reaction of readers and listeners, the degree of visual difference is not always decisive. Just as readers and listeners notice the "D.C." in "Washington D.C." as critically distinguishing the capitol city from the state, so the two capital letters "PR" may serve effectively to signal an important distinction from other uses of "entrepreneur."

This possibility is made more likely because the marks are quite dissimilar when sounded out: The letters "PR" constitute two additional syllables. *Compare Dreamwerks,* 142 F.3d at 1131 ("While we recognize that spelling matters, we're not sure substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks."). Even silent readers usually "hear" words as they read and are likely to notice syllabic differences.

Further, the difference between the marks is not arbitrary but suggests a particular difference in *meaning:* "EntrepreneurPR," presumably meaning "public relations for (or by) a small, independent business owner," has a connotation different from "entrepreneur," standing alone. One could not reasonably assert that EMI's mark "ENTREPRENEUR" implies anything about a public relations function or purpose.

Thus, a juror could rely on the expert testimony refuting the alleged similarity between "ENTREPRENEUR" and "EntrepreneurPR," as well as the actual differences between the marks, and reasonably find the marks dissimilar.

### 3. The Domain Name: entrepreneurpr.com[11]

This court, in *Brookfield,* recently analyzed trademark infringement claims within the unique context of the Internet, focusing in particular on domain names. At issue in *Brookfield* were the trademark "MovieBuff" and the domain name "moviebuff.com." *Brookfield* held that the two monikers were "for all intents and purposes, identical in terms of sight, sound, and meaning," 174 F.3d at 1055, emphasizing that the allegedly infringing second-level domain name[12] used *"exactly"* the same letters as the trademark, *id.* at 1055 n. 18 (emphasis in original). The precise identity was critical, we noted, because Internet users searching for a company's Web site "often assume, as a rule of thumb, that the domain name of a particular company will be the company name [or trademark] followed by '.com.'" *Id.* at 1045, 1055 n. 18.

Here, Smith's second-level domain name, "entrepreneurpr," is *not* exactly the same as EMI's mark, "ENTREPRENEUR." As a result, a consumer attempting to reach EMI's Web site by typing in its magazine's name followed by ".com" would *not* reach Smith's Web site. Nor would a simple spelling or typographical error likely lead a consumer attempt-

---

11. EMI's Complaint alleged trademark infringement of EMI's mark "ENTREPRENEUR"—not of its mark "EntrepreneurMag.com." Thus, this analysis will focus only on similarities and differences between the domain name "entrepreneurpr.com" and the trademark "ENTREPRENEUR."

12. The second level domain name is a term or series of terms (e.g., entrepreneurpr) that is followed by a top level domain name, which frequently describes the nature of the enterprise (e.g., ".com" for "commercial" enterprises or ".org" for "organization"). *Id.* at 1044.

ing to access EMI's Web site to Smith's Web site. This observation concerning the functional similarity of domain names is largely dispositive. *But see id.* at 1055 (also comparing the sight, sound, and meaning of the trademark and domain name). Similarity of marks or lack thereof are context-specific concepts. In the Internet context, consumers are aware that domain names for different Web sites are quite often similar, because of the need for language economy, and that very small differences matter.

Even if we were to look beyond the functional aspects of domain name similarity, however, and consider the domain name as it might appear in text—that is, as an advertisement of the Web site or in a newspaper article discussing it—we would still conclude that Smith's domain name is not as a matter of law similar to EMI's mark. In the context of his domain name, it is true, Smith cannot rely on the capitalization of "PR," as used in his company name, to show visual dissimilarity between his mark and EMI's, because "Web addresses are not caps-sensitive" and therefore will appear in print without case differentiation. *Id.* The differences in sound and meaning between "ENTREPRENEUR" and "EntrepreneurPR," however, as discussed in the context of Smith's company name, still have import in the domain name context.

Overall, we conclude that a juror could reasonably find Smith's entrepreneurpr.com domain name dissimilar from EMI's ENTREPRENEUR mark.

#### c. *Relatedness or Proximity of the Parties' Goods and Services*

We examine the relatedness of the parties' goods because the more closely related the goods are, the more likely consumers will be confused by similar marks. The district court found as a matter of law that the parties' goods are related and

weighed this factor in favor of a finding of likelihood of confusion. "[B]oth parties," noted the district court, "print publications that feature small businesses." We agree that, for this reason, the parties goods are somewhat related. Nonetheless a reasonable juror would have to find that the relatedness factor does not weigh heavily in favor of a finding of likely confusion.

■■ "Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n. 10 (citation and internal quotation marks omitted). In practice, this definition does not necessarily require a close proximity before goods will be found related. For instance, we recently stated that where "both companies offer products and services relating to the entertainment industry generally ... [the companies] are not properly characterized as non-competitors." *Brookfield*, 174 F.3d at 1056.

In this case, however, the fact that both parties' goods relate generally to entrepreneurs or entrepreneurship—in other words, that both parties' products relate to the descriptive word EMI choose for its trademark—can carry relatively little weight in determining the likelihood of confusion. This is so because any individual or company using the word "entrepreneur" as part of the name of its product or service to indicate exactly what the word means—small, independent business owners—is likely to do so because that product or service has something to do with the world of entrepreneurs. To weigh this relationship heavily in favor of a likelihood of confusion in any case brought by EMI would provide an advantage to EMI *because* EMI's mark is weak—descriptive of both its subject matter and intended audience—and would thereby counsel avoidance of such descriptive words in marks.

■ We therefore apply a sliding scale approach as to the weight that relatedness will carry dependent upon the strength of the trademark holder's mark. This approach takes into account the fact that consumers may well recognize that Smith uses terms that include the word "entrepreneur" for what the word *means*, not because of an association with *Entrepreneur* magazine. A sliding scale is therefore the logical way to connect relatedness of products with likelihood of confusion. Such a scale also serves an important balancing function.

While the public and the trademark owner have an interest in preventing consumer confusion, there is also a broad societal interest in preserving common, useful words for the public domain. We do not want to prevent the commercial use of descriptive words to name products, as straightforward names are often the most useful identifiers. An absolute measure of relatedness, in contrast, would discourage use of descriptive words in marks.

In addition to their connection to small businesses, Smith and EMI's companies are both related by their production of print publications. This similarity does not however render the businesses so closely related as to suggest strongly a likelihood of confusion.

EMI's publication, *Entrepreneur* magazine, is a prototypical magazine. It prints articles written by independent writers and selected by EMI's staff in the exercise of journalistic judgment. *Entrepreneur's* revenue is generated through sales of the magazine itself and sales of advertisements for placement within the magazine. Smith's publication, *Entrepreneur Illustrated*, is distributed free of charge and earns revenue solely by contracting with small business clients to have promotional, copyright-free articles, either supplied or approved by the client, included in the publication.

In sum, although we agree that the parties' goods are related, this factor does not weigh heavily in favor of likely confusion as a matter of law.

### d. *Smith's Intent*

■ While "an intent to confuse consumers is not required for a finding of trademark infringement," *Brookfield*, 174 F.3d at 1059, "intent to deceive is strong evidence of a likelihood of confusion," *Interstellar*, 184 F.3d at 1111. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354 (citations omitted). The point is not that an intent to confuse is relevant as some measure of culpability. Rather, the alleged infringer's judgment as to what is likely to be confusing is relevant because it may well be accurate.

Where an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse. *Official Airline Guides*, 6 F.3d at 1394. On the present record, that inference may be drawn only as to Smith's use of "Entrepreneur Illustrated" on his publication's cover, as that is the only use we have held similar as a matter of law to EMI's "ENTREPRENEUR" mark.[13] The inference from knowledge and similarity, however, does not add much in answering the ultimate question here, likelihood of confusion, as the inference provides no *direct* evidence of Smith's judgment concerning likely confusion.

---

**13.** Smith admits that he was aware of EMI's mark "ENTREPRENEUR" when he adopted the marks at issue here.

EMI did, however, offer evidence that throws a sharper light on Smith's intentions. There was testimony by a former EntrepreneurPR employee that when she informed Smith that people seemed to think EntrepreneurPR was related to *Entrepreneur* magazine, Smith replied, "Yeah, it's great." Although Smith's statement was made after he adopted the mark at issue, that timing does not eliminate the significance of Smith's remark. True, the inference that can be drawn from an alleged infringer's knowing adoption of a similar mark focuses on his intent at that time. *Sleekcraft*, 599 F.2d at 354. Smith's direct statement *is* relevant, though, to his intent in continuing to *use* the mark and, as such, is pertinent to liability for trademark infringement. *See* 15 U.S.C. § 1125(a)(1) (providing for liability for one who "uses" a mark likely to cause confusion); *see also Sleekcraft*, 599 F.2d at 354 (noting that the alleged infringer designed a distinctive logo *after* notification of the purported infringement). Smith did present evidence, however, of an unsatisfactory business relationship with this employee, bringing her credibility into question. And, of course, it is for the trier-of-fact, not the court deciding whether to grant summary judgment, to determine issues of credibility. *See TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 684–85 (9th Cir.1990).

In addition, a former EntrepreneurPR client testified that Smith's business partner, John Nixon, told her that the company was going to change its name and stated: "You're familiar with Entrepreneur Magazine, right? Well, we're going to be EntrepreneurPR." Although EMI argues that this statement demonstrates an intent to confuse, a reasonable juror could find otherwise. Nixon may have mentioned *Entrepreneur* magazine only as an example of the common, marketplace use of the somewhat exotic-sounding word "entrepreneur," not to imply an affiliation with the

magazine. This seems especially likely because Nixon was speaking to a client who hired the company before it became "EntrepreneurPR"—and therefore at a time when there was *no* arguable reason to assume an affiliation with EMI. What implication should be drawn from Nixon's statement is a factual question that should not be answered on summary judgment. Furthermore, Smith provided evidence that the client who testified to this statement was involved in a payment dispute with EntrepreneurPR, again raising a credibility issue for the fact-finder to resolve. *See id.*

Finally, an e-mail from an EntrepreneurPR employee to a potential client discussed the benefits of the publicity that EntrepreneurPR could provide and stated: "We'd also like to include you in the next issue of Entrepreneur." EMI argues that this statement means that Smith would arrange to have his clients published in *Entrepreneur* magazine, and thus implies an affiliation with EMI. This is certainly a reasonable interpretation. We note, however, that the reference to "Entrepreneur" may have been simply an unfortunate choice of shorthand for *"Entrepreneur Illustrated."* If so, the reference carelessly encouraged confusion as to an affiliation between EntrepreneurPR and EMI, but does not necessarily prove an *intent* to confuse. The correct interpretation of this e-mail, and the weight it should be given in adjudging Smith's intent, is best left to the trier-of-fact.

Nonetheless, based on the inference from Smith's knowledge of EMI's mark and the other evidence indicating an intent to confuse, the intent factor weighs in favor of finding a likelihood of confusion, although—in light of the limited relevance of the inference, the timing of Smith's remark, and the factual questions surrounding the evidence—not decisively so.

We note that, although we have placed this factor fourth in order of importance to this case, a determination on the merits that Smith intended to deceive consumers would provide "strong evidence of a likelihood of confusion," *Interstellar*, 184 F.3d at 1111, and, as a result, could overcome weaker showings by EMI in other factors.

### e. *Evidence of Actual Confusion*

 "Evidence of actual confusion is strong evidence that future confusion is likely . . . ." *Official Airline Guides*, 6 F.3d at 1393. A reasonable juror may, however, find *de minimis* evidence of actual confusion unpersuasive as to the ultimate issue of likelihood of confusion. *Id.; Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 606–07 (9th Cir.1987).

EMI presented evidence that one of Smith's clients, Phyllis Cesare–Taie, was actually confused as to whether an affiliation existed between *Entrepreneur* magazine and EntrepreneurPR. Cesare Taie testified to such confusion, and other record evidence supports this testimony. In particular, Cesare–Taie is the client who received the e-mail stating that EntrepreneurPR would "like to include [her business] in the next issue of Entrepreneur." And, more important to the issue of actual confusion, another e-mail shows that Cesare Taie sent a check to EntrepreneurPR made payable to "Entrepreneur Magazine." This check is strong evidence of her confusion. Although Smith countered with evidence of a business dispute with Cesare Taie regarding job performance and payment, raising some question as to her credibility, we believe that—in light of the two e-mails—a reasonable juror would have to find on this record that Cesare Taie suffered actual confusion.

EMI also presented the deposition testimony of three other EntrepreneurPR clients who asserted that they believed EntrepreneurPR was related to *Entrepreneur* magazine. Smith rebutted EMI's proffer, however, with evidence that all three of these customers had business disputes with Smith regarding payment and that each began a business relationship with Smith before he changed the name of his company to "EntrepreneurPR," raising questions as to the credibility of the clients' assertions of confusion. Smith also accurately noted that one of the customers seemed "confused about almost everything." This impeachment evidence does throw into substantial question these three clients' testimony regarding actual confusion. Once again, we confront a credibility question that should not be decided on summary judgment. *See TransWorld Airlines*, 913 F.2d at 684–85.

EMI also presented the deposition testimony of two former employees of EntrepreneurPR. Both stated that when making cold calls to solicit business for EntrepreneurPR, they were often asked whether there was an affiliation between EntrepreneurPR and *Entrepreneur* magazine.[14] Such consumer questions are some evidence of actual confusion. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir.1987). At the same time, on the current record, these questions may simply suggest discernment—that, because of the descriptive nature of EMI's mark, consumers in encountering marks using the same term, do *not* necessarily assume a connection with *Entrepreneur* but instead try "to carefully pick out one from the other." *Miss World*, 856 F.2d at 1449. Whether the questions represented actual confu-

---

**14.** These questions were the basis for one of the employee's comment to Smith that people seemed to think EntrepreneurPR was related to *Entrepreneur* magazine (mentioned in the discussion of Smith's intent).

sion or discernment is an issue better left to the trier of fact to resolve.

Furthermore, Smith presented some evidence that he had an unsatisfactory business relationship with the two former employees and that the two did not mention to other employees with whom they worked that they received such questions. Likewise, another employee stated that he encountered such questions on only one or two instances during his long period of employment with EntrepreneurPR. This evidence casts doubt on the credibility of the two employees. As we have noted before, deciding the credibility of the witnesses on evidence such as that presented here is not a matter appropriate on summary judgment. *See TransWorld Airlines,* 913 F.2d at 684–85.

 We believe that the trier-of-fact may find the evidence of actual confusion quite significant; nonetheless, for purposes of summary judgment, EMI has proved only one instance of actual confusion. To constitute trademark infringement, use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product. *Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir.1996) ("[T]he law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.") (citations omitted); *see also Kendall–Jackson Winery,* 150 F.3d at 1052 (noting that "a significant portion of the general public is not likely to be confused"); *Sleekcraft,* 599 F.2d at 353 ("In assessing the likelihood of confusion to the public, the standard used by the court is the typical buyer exercising ordinary caution.") (citations omitted). That there are a few consumers who do not pay attention to obvious differences, and assume common sources where most

other people would not, may not demonstrate the requisite likelihood of confusion.

Because on this record a reasonable juror would have to find that one of EntrepreneurPR's clients was actually confused, this factor weighs in favor of summary judgment for EMI. We do not believe, however, that this factor weighs *heavily* in this direction because a reasonable juror could find *de minimis,* and thus unpersuasive, one instance of actual confusion, and the remaining record evidence involves factual matters subject to dispute. *See Official Airline Guides,* 6 F.3d at 1393 (upholding the district court's determination that "de minimis evidence of actual confusion" was not "persuasive" on this factor); *Nutri/System, Inc.,* 809 F.2d at 606–07 (same).

### f. *Overlap of Marketing Channels*

The district court relied solely upon the fact that the parties "use the Internet as a marketing channel to promote their goods and services"—although it described this evidence as "nominal"—to weigh the overlapping marketing channels factor in favor of finding a likelihood of confusion. *Some* use of the Internet for marketing, however, does not alone and as a matter of law constitute overlapping marketing channels.

The proper inquiries are whether both parties "use the Web as a *substantial* marketing and advertising channel," *GoTo.com,* 202 F.3d at 1207 (emphasis added), whether the parties' marks "are utilized in conjunction with Web-based products," *Brookfield,* 174 F.3d at 1057, and whether the parties' marketing channels overlap in any other way. On the current record, it does not appear that either parties' use of the Web is significant enough to be pertinent.

As to other marketing channels, they do not overlap to any significant degree. *Entrepreneur* magazine is targeted at individ-

uals interested in reading about issues relevant to entrepreneurs; its advertisers are businesses seeking to sell products to that audience. Smith's potential patrons are only a few of the entrepreneurs themselves, in their role not as individual readers but as businesses seeking public relations services. The publications do not compete for subscribers, newsstand purchasers, or advertisers because *Entrepreneur Illustrated* is not for sale and does not feature paid advertisements.[15]

This factor, then, cannot weigh in favor of granting summary judgment to EMI.

### g. *Expansion of Product Lines*

The district court weighed this factor neither in favor of nor against finding a likelihood of confusion. The court found "no evidence" that the parties intended to expand into each other's product lines, but noted that it had previously determined that the parties' marketing channels overlapped to some extent.

Because, as discussed immediately above, the district court erred in finding that the parties' marketing channels overlapped as a matter of law and EMI presented *no* evidence of the parties' intent to expand into each other's product lines, the district court should have weighed this factor against finding likely confusion. On remand, however, the trier of fact should reconsider the issue based on the final record.

### h. *Degree of Consumer Care*

As to the final *Sleekcraft* factor, degree of consumer care, we concur in the district court's assessment that this factor weighs against a finding of likelihood of confusion, because "small business owners seeking public relations services, advertisers and media entities will exercise a moderate degree of care." EntrepreneurPR's services are expensive, at $10,000 per year; media entities constitute at least a moderately sophisticated class of media consumers; and, "[a]s the party opposing the summary judgment motion, [Smith] was entitled to have all inferences of this sort resolved in [his] favor." *American Int'l Group*, 926 F.2d at 832.

### 3. The Overall Balance of the Sleekcraft Factors

Having examined the totality of the facts in the record, we conclude, first, that the way Smith has used the mark "Entrepreneur Illustrated" on the covers of EntrepreneurPR's printed publication, as it appears in the record, would likely confuse an appreciable number of reasonably prudent consumers, and thus infringed EMI's trademark "ENTREPRENEUR." We reach this result because of the strong visual similarity of the marks—due to the small size and the degree of obstruction of the word "Illustrated"—and because of Smith's knowing adoption of this similar mark and other evidence demonstrating Smith's intent to deceive. *See*

---

**15.** Even viewing *Entrepreneur Illustrated's* articles as advertisements (since EntrepreneurPR's clients pay for their inclusion in the publication), a juror could still reasonably find the markets do not overlap because of the "substantially higher" price of advertising in *Entrepreneur* magazine. *Official Airline Guides*, 6 F.3d at 1392. EntrepreneurPR's clients pay up to $10,000 on a yearly basis for a full-page article in *Entrepreneur Illustrated;* EMI charges a minimum of $30,470 for a black and white one-page advertisement if the

buyer agrees to purchase at least thirty advertisements within a single year.

EMI did provide evidence that it distributes complementary copies of *Entrepreneur* magazine to the media, and Smith asserts that *Entrepreneur Illustrated* is only circulated by free distribution to the media. However, because of EMI's yearly paid circulation of approximately 540,000 copies, this evidence of overlap with regard to free distribution appears de minimis.

*Official Airline Guides,* 6 F.3d at 1394. Likewise, EMI's mark is strong enough, and the parties' print publication products are sufficiently related, to support this conclusion. We therefore affirm the district court's grant of summary judgment to EMI on this issue.

 As to all other allegations of trademark infringement, EMI has not demonstrated on this record that Smith has infringed its trademark as a matter of law. A trier of fact could reasonably conclude that *none* of the eight *Sleekcraft* factors weighs strongly in favor of a finding of likely confusion as to these allegations. Perhaps more importantly, the weakness of EMI's mark alone weighs heavily against finding infringement as a matter of law. Consumers will likely recognize that the word "entrepreneur" as used in Smith's marks refers to small, independent business owners, not to EMI, making EMI's showings as to other factors less persuasive on the ultimate question of likelihood of confusion than they otherwise would be. *Cf. Sleekcraft,* 599 F.2d at 350 ("Although appellant's mark is protectible and may have been strengthened by advertising, it is a weak mark entitled to a restricted range of protection. Thus, only if the marks are quite similar, and the goods closely related, will infringement be found.") (internal citation omitted). We therefore reverse the district court's entry of summary judgment in EMI's favor as to those other uses and remand for trial.

## C. The Unfair Competition Claim

 The district court granted summary judgment in EMI's favor on its unfair competition claim brought under California Business & Professions Code § 17200. Because "actions pursuant to ... § 17200 are 'substantially congruent' to claims made under the Lanham Act," *Cleary v. News Corp.,* 30 F.3d 1255, 1263 (9th Cir.1994), we reverse and remand on this claim in accord with our decision on the Lanham Act claim.

## D. The Injunction

Because we reverse the district court's decision finding trademark infringement by Smith's use of the terms "EntrepreneurPR" for the name of his business, "entrepreneurpr.com" for his business' Web site domain name, and "Entrepreneur Illustrated" as the name of his company's printed publication other than its appearance on the publication's cover, the district court's injunction may not stand to the extent it enjoins these uses. On remand, the district court should devise an injunction that only enjoins Smith from using the term "Entrepreneur Illustrated" on the cover of a printed publication in a manner that obstructs or otherwise downplays the word "Illustrated."

## E. Damages

Because we reverse much of the district court's decision, we reverse its decision to grant damages. If appropriate, the district court may consider this issue anew after a trial on the merits.

## III. CONCLUSION

Although EMI has the exclusive right to use the trademark "ENTREPRENEUR" to identify the products described in its registration, trademark law does not allow EMI to appropriate the *word* "entrepreneur" for its exclusive use. The descriptive nature and common, necessary uses of the word "entrepreneur" require that courts exercise caution in extending the scope of protection to which the mark is entitled. We have applied the *Sleekcraft* factors with that caution in mind, and, on remand, the district court should as well.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR TRI-AL.

Costs to Appellant.