**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

REARDEN LLC; REARDEN
PRODUCTIONS LLC; REARDEN
STUDIOS LLC; REARDEN PROPERTIES
LLC, California limited liability
companies; REARDEN, INC., a
California corporation,
          *Plaintiff-Appellants,*

                    v.

REARDEN COMMERCE, INC., a
California corporation,
          *Defendant-Appellee.*

No. 10-16665

D.C. No.
3:06-cv-07367-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California, San Francisco
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
December 8, 2011—San Francisco, California

Filed June 27, 2012

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Cowen

---

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

**COUNSEL**

Deanne E. Maynard (argued), Washington, DC, for the appellants.

Richard D. Harris (argued), Chicago, Illinois, for the appellee.

**OPINION**

COWEN, Circuit Judge:

Plaintiffs Rearden LLC, Rearden Productions LLC, Rearden Studios LLC, Rearden, Inc., and Rearden Properties LLC appeal from the orders of the United States District Court for the Northern District of California granting summary judgment in favor of Defendant Rearden Commerce, Inc. In two rulings, the District Court granted Rearden Commerce's motions for summary judgment with respect to Appellants' claims under the Lanham Act, the Anticybersquatting Consumer Protection Act ("ACPA"), California's common law of trademark infringement, and the California Unfair Competition Law ("UCL"). Because there are genuine issues of material fact, we vacate and remand for further proceedings consistent with this opinion.

I.

Steve Perlman founded Rearden Steel, Inc. in May 1999. He chose this name, at least in part, because it was a reference to the "Hank Rearden" character from Ayn Rand's novel, *Atlas Shrugged*. This company changed its name to Rearden Studios, Inc. in March 2002, Rearden, Inc. in October 2004, and, finally, Rearden LLC in June 2006. Rearden LLC was only the first of several Bay Area-based "Rearden" companies started by Perlman. Other Rearden entities include: (1) Rearden Studios LLC (which was originally incorporated as Rearden Steel Entertainment, Inc. in March 2000, and then changed its name to Rearden Entertainment, Inc. in March 2002, Rearden Studios, Inc. in February 2005, and Rearden Studios LLC in June 2006); (2) Rearden Productions LLC (which was incorporated as Look Aside Productions, Inc. in March 2000, changed its name in the same month to Rearden Steel Productions, Inc., and then became Rearden Productions, Inc. in March 2002 and Rearden Productions LLC in June 2006); and (3) Rearden Properties LLC.

Appellants have offices in San Francisco and Palo Alto, and they collectively employ approximately one hundred employees. They also operate a number of websites, including "Rearden.com" (their main website, which has been in operation since April 2001), "ReardenSteel.com" (maintained since November 1999), "ReardenStudios.com" (since March 2002), and "ReardenLabs.com" (since May 2005).

"The Rearden companies are technology incubators and artistic production companies." *Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1012 (N.D. Cal. 2009) ("*Rearden I*") (citation omitted). Simply put, an incubator provides resources and support for the ground-up development of start-up ventures. Such resources and support include office space, personnel, equipment, IT infrastructure, funding, credit guarantees, insurance, administrative services, benefits, travel services, marketing, creative ideas, intellectual property, and domain names. In turn, Appellants sometimes contract with third parties in order to provide certain services. For example, they have entered into a partnership with TriNet, a human resources company, to provide their affiliates with online access to payroll and benefits management services as well as the ability to purchase such services as airline, hotel, and dining reservations, car services, and event tickets.

Unlike Rearden Commerce, Appellants generally do not distinguish between the various Rearden entities for the purposes of this lawsuit. The District Court likewise frequently referred to "the Rearden companies" or, simply, to "Rearden." It also pointed out that Rearden LLC, as the "flagship entity," actually provides the resources and support for the ground-up development of new ventures. *Id.* at 1013. On the other hand, Rearden Productions LLC and Rearden Studios LLC specialize in high definition and animated movie production services. Finally, Rearden Properties LLC is a property ownership and management company that rents three units in a San Francisco building to the other Rearden entities.

Appellants own a registered mark in the words "Rearden Studios" as well as in a blue and black logo featuring a prominent figure of an Amazon warrior and the words "REARDEN STUDIOS." Specifically, the company now known as Rearden LLC originally sought protection from the Patent and Trademark Office ("PTO") for this mark on April 20, 2002, and registration was ultimately obtained on November 1, 2005. On May 31, 2007, Appellants filed "intent-to-use" applications for the following marks: "Rearden," "Rearden Companies," "Rearden Commerce Email," "Rearden Personal Email," "Rearden Mobile," "Rearden Wireless," and "Rearden Communications." In addition to alleging that Rearden Commerce has infringed on their "Rearden Studios" mark and name, Appellants claimed that Rearden Commerce has infringed on a large number of other alleged "Rearden" marks and names, including "Rearden," "Rearden LLC," "Rearden Productions," "Rearden Properties," "Rearden Commerce Email," "Rearden Companies," "Rearden Entertainment," "Rearden, Inc.," "Rearden Labs," "Rearden Personal Email," and "Rearden Steel." Partly because Rearden Commerce has frequently referred to itself simply as "Rearden," the District Court (following the example set by Appellants themselves) believed it was appropriate to focus on the word "Rearden," which appears in each of the Appellants' names.

The alleged infringer, Rearden Commerce, Inc., is a Silicon Valley-based business concierge company. Simply put, it offers a proprietary web-based platform called the "Rearden Personal Assistant," which links its clients, specifically businesses and professionals, to an online marketplace where they then are able to search for, compare, purchase, and manage a variety of business and travel-related services from more than 130,000 different vendors (including such well-known companies as American Airlines, Hertz, Hilton, and WebEx). The available services include air, car, hotel, and dining reservations, event tickets, web conferencing, and package shipping.

Patrick Grady founded Rearden Commerce as Gazoo Corporation in 1999. He then changed its name to Talaris two

years later. Grady also has an affinity for Rand's "Hank Rearden" character. In August 2004, Talaris accordingly reserved the California corporate name "Rearden, Inc.," but it ultimately lost this reservation to Appellants in October 2004. After reserving the "Rearden Commerce" name in November 2004, Talaris officially changed its name to Rearden Commerce in January 2005. The renamed company then relaunched its main website as "ReardenCommerce.com" in February 2005 (a domain name that Rearden Commerce had obtained in August 2004). On March 4, 2005, it formally filed applications with the PTO for the "Rearden Commerce with logo" and "Rearden Commerce" marks. The red and black logo consists of a stylized letter "R" next to the words "REARDEN commerceTM." The applications were formally published for opposition on July 4, 2006 and October 31, 2006, and Appellants thereby became aware of Rearden Commerce and its alleged marks.

Rearden Commerce also began to obtain a variety of Internet domain names incorporating the word "Rearden."[1] A user

---

[1] We have provided the following explanation of the domain name system:

"Every computer connected to the Internet has a unique Internet Protocol ("IP") address. IP addresses are long strings of numbers, such as 64.233.161.147. The Internet [domain name system] provides an alphanumeric shorthand for IP addresses. The hierarchy of each domain name is divided by periods. Thus, reading a domain name from right to left, the portion of the domain name to the right of the first period is the top-level domain ('TLD'). TLDs include .com, .gov, .net, and .biz. Each TLD is divided into second-level domains identified by the designation to the left of the first period, such as 'example' in 'example.com' or 'example.net.' . . . Each domain name is unique and thus can only be registered to one entity. . . .

A domain name is created when it is registered with the appropriate registry operator. A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain

accessing one of these domain names is then redirected to the company's primary website. In particular, Rearden Commerce registered the following domain name "families" (e.g., ".com," ".org") on March 4, 2005: (1) "ReardenInc"; (2) "ReardenCo"; and (3) "ReardenC."[2]

On October 31, 2006, the same day it agreed to an extension of time for Appellants to file a possible opposition to its applications with the PTO, Rearden Commerce, at the direction of General Counsel Gabriel Sandoval, registered the "ReardenLLC.com" domain name. It then registered the "ReardenLLC.net" domain name on November 6, 2006 and the "ReardenMobile.com" and "MobileRearden.com" names on November 10, 2006. As of December 1, 2006, Rearden Commerce began directing individuals accessing the "ReardenLLC" domain names to its main website.

Appellants, in a letter dated November 7, 2006, informed Rearden Commerce that their research revealed a conflict between the parties' marks and names and accordingly asked for a response by November 17, 2006. According to Appellants, no substantive response was provided, and they filed suit on November 30, 2006.

---

name servers. The domain name servers direct Internet queries to the related web resources. A registrant can register a domain name only through companies that serve as registrars for second level domain names. Registrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants. . . ."

*Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698-99 (9th Cir. 2010) (alteration in original) (quoting *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 464 F. Supp. 2d 948, 951-52 (N.D. Cal. 2006)).

[2]There appears to be a dispute as to the registration date of the "ReardenC.com" domain name—namely whether it was registered on March 4, 2005 or June 12, 2007.

In their initial complaint, Appellants advanced the following claims against Rearden Commerce: (1) false designation of origin under the Lanham Act, 15 U.S.C. § 1125; (2) common law trademark infringement; (3) violations of the California UCL, Cal. Bus. & Prof. Code § 17200; and (4) false advertising under California law, Cal Bus. & Prof. Code § 17500. Perlman subsequently discovered, among other things, Rearden Commerce's registration of the "Rearden-LLC" domain names as well as the fact that it was directing traffic from these domain names to its main website.

At a mediation session held on June 6, 2007, Appellants demanded that Rearden Commerce cease its alleged cybersquatting. As a supposed sign of good faith, Rearden Commerce ceased directing traffic from the "ReardenLLC" and the "ReardenInc" domain names to its main website. While denying any wrongdoing on its part and refusing to assign the domain names, Rearden Commerce "parked" the "Rearden-LLC" domain names (i.e., a generic Network Solutions web page was displayed on the screen to any person accessing these domain names) until the case was resolved or the District Court directed otherwise.

On June 11, 2007, Appellants accused Rearden Commerce of cybersquatting in connection with the "ReardenC.com" domain name. They also asked Rearden Commerce to agree to a stipulated preliminary injunction prohibiting the company from using various "Rearden" domain names and from registering or using any domain name containing Appellants' corporate names, brands, trademarks, or trade names, with the sole exception of the "ReardenCommerce" domain name. In a June 19, 2007 letter from its attorneys, Rearden Commerce refused to agree to this injunction. However, it did state that, "[i]n that same spirit of compromise, and without any admissions, Rearden Commerce would be willing to voluntarily maintain the nondirecting nature of the 'reardenllc.com,' 'reardenllc.net,' 'reardeninc.net,' 'reardeninc.org,' and 'reardeninc.us' domain names—provided that your client agrees to

withdraw the trademark applications it has filed on May 31, 2007 directed to REARDEN COMMERCE EMAIL, REARDEN PERSONAL EMAIL, REARDEN MOBILE, REARDEN WIRELESS, REARDEN COMMUNICATIONS, REARDEN COMPANIES, AND REARDEN—based upon our clients' marks and announced new products." (ER208.)

On August 14, 2007, Appellants amended their complaint to allege, inter alia, that Rearden Commerce's purchase of several domain names violated the ACPA, 15 U.S.C. § 1125(d), and constituted corporate name infringement and unfair competition under California law. Appellants also moved for a preliminary injunction, which was granted by the District Court. Expressly rejecting Rearden Commerce's claim that the issue was now moot, the District Court enjoined the company from directing traffic from the "ReardenLLC" domain names and from registering any other domain name containing the words "Rearden LLC."

The parties filed cross-motions for summary judgment as to Appellants' trademark-related claims. In an extensive memorandum and order, the District Court granted Rearden Commerce's motion for summary judgment and denied Appellants' motion.

After acknowledging that the federal and state trademark claims were subject to the same legal standards, the District Court stated that "[t]he first step in the analysis is to determine whether there is any genuine issue of material fact as to whether the Rearden companies have used 'Rearden' in commerce so as to give rise to a protected right." *Rearden I*, 597 F. Supp. 2d at 1016. The District Court called into question whether there is any evidence at all showing that "Rearden has marketed any products or services to consumers using the Rearden name" and whether it has any actual customers. *Id.* at 1017. It specifically turned to an exchange that occurred between the parties' attorneys at oral argument: "At oral argument, defense counsel stated that the Rearden companies have

served only to incubate Perlman's ideas and that no one actually pays Rearden to have their ideas incubated. Plaintiffs' counsel did not challenge that characterization, other than to state that outside persons 'could' come to Rearden." *Id.* (citation omitted). Nevertheless, the District Court ultimately assumed without deciding that there was a triable issue of fact with respect to the "use in commerce" requirement because its "likelihood of confusion" analysis sufficed to dispose of the trademark claims.

After establishing a protectable interest in the trade or service mark or name at issue, a plaintiff must then show that the defendant's use of the mark or name creates a likelihood of confusion. The District Court turned to the eight factors identified by this Court in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), for assistance in determining whether such confusion is likely: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Rearden I*, 597 F. Supp. 2d at 1018 (citing *Sleekcraft*, 599 F.2d at 348-49).

The District Court found that two factors weigh—albeit only "somewhat" so—in favor of a "likelihood of confusion" finding. Specifically, the "Rearden" mark constitutes a suggestive mark entitled to a certain degree of protection. The District Court similarly acknowledged the similarities between the name "Rearden Commerce" and the names of the various Rearden companies.

On the other hand, the District Court explained at some length why: (1) the "proximity of the goods" and "type of goods and the degree of care likely to be exercised by the purchaser" factors "strongly" weigh against a finding of a likelihood of confusion; (2) the "marketing channels used" and "likelihood of expansion of the product lines" factors weigh

against any such finding; and (3) the "evidence of actual confusion" factor does not support a "likelihood of confusion" finding, and there is no basis for a reasonable finder of fact to conclude that Rearden Commerce acted in bad faith.

Among other things, the District Court rejected Appellants' various theories of why the parties should be considered to be in competitive proximity. According to the District Court, no reasonably prudent consumer seeking to obtain start-up support would mistake Rearden Commerce's online marketplace for Appellants' incubation business. In turn, no prudent consumer seeking a web-based means to search, compare, and purchase a variety of business services would mistake Appellants' start-up incubation services for Rearden Commerce's online personal assistant program.

The District Court likewise concluded that it would be unreasonable for a finder of fact to find that the relevant consuming public has experienced any real confusion. It explained, inter alia, that nearly every example of purported confusion in the record involved a vendor or an industry insider of some sort, while the critical determination is whether prospective purchasers are likely to be deceived, regardless of the experiences of vendors, industry insiders, and job-seekers. The District Court therefore went on to reject Appellants' argument that confusion on the part of investors, vendors, and suppliers can support a finding of infringement even in the absence of any evidence of actual consumer confusion. Turning to the only alleged incidents appearing to demonstrate confusion on the part of members of the relevant consuming public (a Rearden Commerce customer known as QubicaAMF expressed confusion as to which "Rearden" it conducted business with after receiving a subpoena in this lawsuit, and Appellants received dozens of misdirected e-mails originally intended for Rearden Commerce, some of which were sent by Rearden Commerce's own customers), the District Court believed that both examples (as well as the various incidents involving vendors or industry insiders)

merely involved, at best, confusion with respect to the parties' names or affiliations and, possibly, simple confusion as to the correct e-mail addresses.

The District Court ultimately concluded that no reasonable jury could find, even after drawing any factual inferences in the light most favorable to Appellants, that Rearden Commerce's use of "Rearden" creates a strong likelihood of confusion in the minds of the relevant consuming public. It then concluded that, given its "likelihood of confusion" analysis, Rearden Commerce's use of the term "Rearden" could not be considered "false and misleading" under California's false advertising statutory provision. *Id.* at 1027. The District Court likewise granted summary judgment in favor of Rearden Commerce as to the UCL claim "to the extent that [it] relies upon trademark infringement, rather than cybersquatting." *Id.*

The District Court subsequently denied Appellants' motion for reconsideration, expressly rejecting, among other things, their contention that it improperly failed to consider non-consumer confusion. Appellants and Rearden Commerce then filed motions for summary judgment on the remaining cybersquatting-related claims. For a second time, the District Court granted Rearden Commerce's motion and denied the motion filed by Appellants.

The District Court began with the threshold question of whether (and at what point in time) Appellants have made sufficient use of their "Rearden" marks and names in the sale or advertising of their services. The results were mixed.

On the one hand, it determined that "plaintiffs cannot establish a valid, protectable interest in any 'Rearden' mark prior to July 2005." *Rearden LLC v. Rearden Commerce, Inc.*, No. C 06-7367 MHP, 2010 WL 2650516, at *5 (N.D. Cal. Jul. 1, 2010) ("*Rearden II*") (footnote omitted). Accordingly, summary judgment was granted in favor of Rearden Commerce with respect to the multiple domain names acquired before

that date. In the process, the District Court considered but rejected various pieces of evidence as insufficient to satisfy the "use in commerce" requirement (i.e., a trademark status report, multiple newspaper articles mentioning Appellants, an office lease agreement, an independent contractor agreement for administrative, accounting, and information services between Rearden Studios and Ice Blink Studios, e-mail correspondence regarding services, instances in which Appellants were credited with providing services for various production projects, and merchandise distributed by Appellants).

According to the District Court, "[a] reasonable jury could, however, find that plaintiffs used the 'Rearden Studios' mark as early as July 2005." *Id.* The District Court pointed to Appellants' entry in the July 2005 "Reel Directory" as evidence that "could establish use or display 'in the sale or advertising of services' along with the rendering of those services in commerce." *Id.* at *4 (quoting 15 U.S.C. § 1127). Likewise, it indicated that Rearden Studios's July 2006 agreement to provide editing services to Electronic Arts could represent an example of rendering services in commerce. The District Court therefore did not grant Rearden Commerce's summary judgment motion on "use in commerce" grounds as to the domain names evidently obtained by the company after July 2005: "ReardenLLC.com," "ReardenLLC.net," "ReardenMobile.com," "MobileRearden.com," and "ReardenC.com."

The District Court then considered whether Rearden Commerce acted with a bad faith intent to profit with respect to these five specific domain names. After acknowledging that the most important grounds for finding bad faith consist of the unique circumstances of the case, it applied the nine nonexclusive statutory factors that may be considered in determining whether a party acted in bad faith.[3] According to the

---

[3]The non-exclusive factors consist of the following:

District Court, the first, third, fifth, sixth, and eighth factors favor Rearden Commerce. While the fourth and seventh fac-

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

tors are neutral (and the ninth factor is irrelevant), the second factor "marginally" favors Appellants with respect to the "ReardenLLC" domain names and favors Rearden Commerce with respect to the other domain names.

The District Court accordingly granted summary judgment in favor of Rearden Commerce as to the "ReardenMo-bile.com," "MobileRearden.com," and "ReardenC.com" domain names. While indicating that it could also conclude as a matter of law on the basis of the statutory factors that the "ReardenLLC" domain names were not acquired in bad faith, it nevertheless addressed the unique circumstances of the case. Relying in particular on the deposition testimony offered by Rearden Commerce General Counsel Sandoval, the District Court determined that "a jury could find that [Rearden Commerce] had not earlier considered the ReardenLLC domain names during its initial registration frenzy, registered them when it became aware of the potential domain names, and registered them as part of its long-standing program." *Id.* at *9. According to the District Court, the company's decision to cease using the "Rearden LLC" domain names, its belief that it is the proper mark owner, and its unconditional offer (made at oral argument held in connection with the second round of summary judgment motions) to transfer the domain names to Appellants further demonstrate Rearden Commerce's good faith. The District Court questioned why Appellants chose to continue litigating this issue after Rearden Commerce's unconditional offer was made.

In the end, the District Court determined that no reasonable jury could find the existence of bad faith with respect to any of the domain names, even those registered prior to July 2005. It also granted summary judgment to Rearden Commerce with respect to the related UCL claim.

Judgment was entered dismissing the current action in its entirety, and Appellants appealed.

II.

The District Court possessed subject matter jurisdiction over Appellants' claims pursuant to 28 U.S.C. §§ 1331 and 1338. We have appellate jurisdiction under 28 U.S.C. § 1291.

We exercise de novo review over the District Court's summary judgment rulings in favor of Rearden Commerce. *See, e.g.*, *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1029 (9th Cir. 2011). "Viewing the evidence in the light most favorable to [the non-moving party], we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citing *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010)).

"Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Interstellar Starship Servs, Ltd. v. Epix Inc.* 184 F.3d 1107, 1109 (9th Cir. 1999) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985)); *see also, e.g.*, *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1029, 1031 (9th Cir. 2010); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002).

The parties filed cross-motions for summary judgment before the district court. "When the district court disposes of a case on cross-motions for summary judgment, we may review both the grant of the prevailing party's motion and the corresponding denial of the opponent's motion." *Redevelopment Agency of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 672 (9th Cir. 2011) (citations omitted); *see also, e.g.*, *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard." (citation omitted)), *cert. denied*, 131 S. Ct. 900 (2011). Because Appellants do not challenge the District Court's denial of their own summary

judgment motions, we do not review that portion of the District Court's decisions. Instead, we review only the District Court's grant of Rearden Commerce's motions as to the trademark infringement, cybersquatting, and UCL claims. Rearden Commerce contends that Appellants, by filing their own motions for summary judgment, thereby conceded the absence of any genuine issues of material fact. However, we do not believe that a plaintiff who moves for summary judgment somehow gives up the right to argue that the defendant's own motion should have been denied due to genuine issues of material fact. Because of differences in their legal arguments, the parties can disagree as to which disputed facts are "material."

## III.

### A.   Appellants' Federal Claims

####   1.   The Lanham Act

**[1]** The parties generally agree on the basic elements of Appellants' federal causes of action. To prevail on its Lanham Act trademark claim, a plaintiff " 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.' " *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)). "It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16.03 (3d ed. 1996)). Therefore, a party

pursuing a trademark claim must meet a threshold "use in commerce" requirement.[4]

### a.  The "Use In Commerce" Requirement

Defending the District Court's application of this requirement, Rearden Commerce contends that Appellants' trademark claims must be rejected because Appellants' use of the "Rearden Studios" mark began at least five months after Rearden Commerce had already begun using its own marks in commerce. It further argues that summary judgment was appropriately granted in its favor with respect to the various domain names it acquired before July 2005. However, especially given our obligation to construe the evidence in the light most favorable to the non-moving party as well as the highly circumstantial nature of this threshold requirement, we agree with Appellants that there are genuine issues of material fact with respect to their use of the "Rearden" marks and names.[5]

---

[4]Furthermore, the District Court properly observed that trademark and trade name claims are governed by the same general principles. *See, e.g.*, *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534-36 (9th Cir. 1989). We also note that trade and service marks are analyzed under the same basic "likelihood of confusion" framework. *See, e.g.*, *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 603-04 (9th Cir. 1987).

[5]Appellants contend that the "use in commerce" issue with respect to their trademark claim should be decided in the first instance by the District Court. They do note that the District Court assumed in its summary judgment decision addressing their trademark claim that there is a triable issue of fact as to whether their use of the "Rearden" mark and name has constituted sufficient public use and proceeded to its dispositive "likelihood of confusion" analysis. In contrast, the District Court did rule on "use in commerce" grounds in its subsequent summary judgment ruling disposing of Appellants' cybersquatting claim. However, while it appropriately acknowledged in its initial decision that courts have begun to accord protection to a particular trademark where the totality of the circumstances suffices to establish a right to use that trademark, the District Court did not really take into account this "totality of the circumstances" principle in its subsequent ruling beyond mentioning in a footnote that protection prior to actual sales may arise where the totality of the circumstances establishes

The Lanham Act, as amended by the 1988 Trademark Law Revision Act, states that "[t]he term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The statute goes on to provide that:

> For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the ser-

a right to use the trademark and then stating that Appellants never argued that their rights vested through use prior to any actual sales. In the end, we address the "use in commerce" issue because the merits are fully briefed, the trademark and cybersquatting claims (which also implicate the "use in commerce" question) do appear to be related, and Appellants themselves ask for such a ruling in their opening brief. Nevertheless, we do not overlook the somewhat unusual procedural circumstances present here.

vices is engaged in commerce in connection
with the services.

*Id.* As the parties and the District Court have recognized, this case specifically implicates the alleged use of service marks.

"The Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999). "The purpose of a trademark is to help consumers identify the source, but a mark cannot serve a source-identifying function if the public has never seen the mark and thus is not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner." *Id.*

In fact, the specific statutory language governing service marks contemplates the existence of two elements that must be satisfied in order to meet the "use in commerce" requirement. In short, "a mark shall be deemed to be in use in commerce . . . on services when it used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127; *see also, e.g.*, *Int'l Bancorp, LLC. v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 373 (4th Cir. 2003) ("But in short, section 1127 defines the term 'use in commerce' with respect to services as being when a mark is 'used or displayed in the sale or advertising of services *and* the services are rendered in commerce.' As a consequence of the *conjunctive* command, it is not enough for a mark owner simply to render services in foreign commerce for it to be eligible for trademark protection. Nor is it enough for a mark owner simply to use or display a mark in the sale or advertising of services to United States consumers. *Both* elements are required, and *both* elements must be distinctly analyzed."); *Chance v. Pac-*

*Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001) ("For both goods and services, the 'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display." (citing 15 U.S.C. § 1127)). Consistent with this dual requirement, we observed in a trademark case that "mere advertising by itself may not establish priority of use." *New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979) (citing *Consumers Petroleum Co. v. Consumers Co. of Ill.*, 169 F.2d 153 (7th Cir. 1948); *Deltronics, Inc. v. H. L. Dalis, Inc.*, 158 U.S.P.Q. 475 (1968)). We have, in turn, gone on to apply this basic principle in the service mark context.[6] *See, e.g.*, *Chance*, 242 F.3d at 1156-60.

In determining whether the two prongs of the "use in commerce" test have been satisfied, we have (as the District Court recognized in its initial summary judgment ruling) generally followed a "totality of the circumstances" approach. This approach turns on " 'evidence showing, first, adoption, and, second, Use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind.' " *New W. Corp.*, 595 F.2d at 1200 (quoting *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951)). Our adoption of the "totality of the circumstances" approach reflects a movement away from the previous approach set forth in *Sengoku Works Ltd. v. RMC International., Ltd.*, 96 F.3d 1217 (9th Cir. 1996), in which we suggested that parties must "actually use the mark in the sale of goods or services, *id.* at 1219 (citing 2 McCarthy, *supra*, § 16.03), to acquire ownership in that mark. We have since indicated that evidence of actual sales, or lack thereof,

---

[6]Appellants quote our statement in *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601 (9th Cir. 1987), that rights in a service mark " 'may be acquired by use in advertising alone.' " (Appellants' Brief at 43 (quoting *Nutri/System*, 809 F.2d at 604). We, however, made this passing statement in the specific context of rejecting the theory that "the test for determining infringement [of service marks acquired by advertising] must differ from that applied to trademarks or service marks acquired by more than advertising alone." *Id.* at 604.

is not dispositive in determining whether a party has established "use in commerce" within the meaning of the Lanham Act. Instead, we have acknowledged the potential relevance of non-sales activity in demonstrating not only whether a mark has been adequately displayed in public, but also whether a service identified by the mark has been "rendered in commerce," 15 U.S.C. § 1127.

As we explained in *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151 (9th Cir. 2001):

> In applying [the "totality of the circumstances"] approach, the district courts should be guided in their consideration of non-sales activities by factors we have discussed, such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

*Id.* at 1159. Applying this approach, we determined that the plaintiff's activities in promoting his lost and found tag service, such as mailing 35,500 post cards but generating only 128 telephone responses and not a single sale, were insufficient to raise a triable issue of fact as to "use in commerce." *Id.* at 1159-60. On the other hand, we held that the defendant had established first use of the mark in commerce because, among other things, its predecessor used the mark as part of its business name and the defendant had itself begun a public relations campaign using the mark to introduce a new service (namely a radio-frequency based system for tracking and

recovering fleet vehicles), in which it sent out brochures to potential customers, conducted interviews with major newspapers resulting in a number of stories mentioning the mark, and marketed the service through a slide presentation to potential customers. *Id.* at 1160.

As *Chance* makes clear, non-sales activities such as solicitation of potential customers may be taken into account as part of the "totality of the circumstances" inquiry. *See, e.g.*, *Dep't of Parks & Recreation v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1125-27 (9th Cir. 2006); *Chance*, 242 F.3d at 1156-60; *Brookfield*, 174 F.3d at 1050-53; *New W. Corp.*, 595 F.2d at 1199-1201. At the very least, such non-sales activities, may be relevant in determining whether the "used or displayed in the sale or advertising of services," 15 U.S.C. § 1127, element is satisfied. And, depending on the circumstances, the non-sales activity may also be relevant to assessing whether a party has satisfied the "services are rendered in commerce," *id.*, element.

**[2]** Accordingly, even if a party completes the initial sale of its services only after its opponent has done so, that party still could establish prior use of the contested mark based on its prior non-sales activities. For instance, this Court observed in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999), that "we have indeed held that trademark rights can vest even before any goods or services are actually sold if 'the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark,'" *id.* at 1052 (alterations in original) (quoting *New W. Corp.*, 595 F.2d at 1200); *see also, e.g.*, *Bazaar del Mundo*, 448 F.3d at 1126 ("Although mere advertising by itself may not establish priority of use, *New West Corp.*, 595 F.2d at 1200, advertising combined with other non-sales activity, under our 'totality of the circumstances test,' *Pac-Tel Teletrac*, 242 F.3d at 1158, can constitute prior use in commerce."); *Chance*, 242 F.3d at 1158-59 (discussing *Brookfield*). The District Court recognized the existence of this

"prior to actual sales" principle, especially in its initial summary judgment ruling. But, as the District Court likewise noted, we have also made it clear that such non-sales activities still must be sufficiently public in nature to identify or distinguish the goods or services in an appropriate segment of the public mind as belonging to the owner. *See, e.g.*, *Brookfield*, 174 F.3d at 1052 (quoting *New W. Corp.*, 595 F.2d at 1200).

Turning to the factual circumstances now before us, we begin our analysis with the "services are rendered in commerce" element. 15 U.S.C. § 1127. Initially, Appellants point to evidence in the record purportedly showing that they have offered incubation-related services to a variety of start-up companies, including: (1) securing $67 million in outside funding for Rearden Steel Technologies in April 2001; (2) spinning off Rearden Steel Technologies as Moxi Digital, Inc. in January 2002; (3) providing a range of incubation services to Ice Blink Studios LLC in 2004; (4) receiving $12.5 million for the sale of a minority interest in a Rearden-incubated start-up, OnLive, Inc., in 2007 (after Rearden Commerce began using its own marks in commerce); and (5) providing incubation services to another company called MOVA LLC.

It does appear that, at the very least, many (and possibly even all) of these incubated companies were actually created by Perlman himself. For example, Perlman acknowledged that he founded Rearden Steel Technologies in September 1999. In turn, Rearden Commerce quite understandably draws attention to the District Court's account in its first summary judgment decision of what was said by counsel at oral argument—namely, that Rearden Commerce's attorney claimed that Appellants have only ever incubated Perlman's ideas and no one has paid them to have their ideas incubated and that Appellants' attorney merely responded that outside persons could come to his clients for incubation services. There is even evidence in the record indicating that Ice Blink Studios was one of Perlman's own creations. If Appellants have only

ever incubated new ventures started by Perlman and have never provided or even offered their incubation services to outsiders, their purported incubation business would fail to meet either element of the "use in commerce" requirement. In other words, "[i]f the Rearden entities merely use the name amongst themselves," *Rearden I*, 597 F. Supp. 2d at 1018, they would fail to show use in a way sufficiently public in nature to identify or distinguish the services in an appropriate segment of the public mind, *see, e.g.*, *Brookfield*, 174 F.3d at 1052.

**[3]** Nevertheless, we still believe that there are genuine issues of material fact here as to whether Appellants have provided, at least once, incubation services to outside persons. In discussing the incubation of Ice Blink Studios, Perlman stated in a declaration that incubation services "were provided and/or administered by the Rearden incubator, and in return, Ice Blink Studios paid Rearden an ongoing fee." (ER612-ER613.) Appellants subsequently submitted to the District Court a copy of the November 5, 2004 "Standard Independent Contractor Agreement" entered by "Rearden Studios, Inc." and "Ice Blink Studios, LLC." (ER255-ER257.) In exchange for a monthly payment of $1750 plus expenses (with a maximum of $13,000), Rearden Studios, as an independent contractor, expressly agreed to provide Ice Blink Studios with administrative, accounting, and communications and technology services from June 1, 2004 until December 31, 2004.[7]

**[4]** In any case, the record also contains more than enough evidence that Appellants have provided non-incubation services in order to preclude summary judgment on "services are rendered in commerce" grounds. It appears that Appellants participated in a 2001 movie project for Cinemax, and, in particular, one of the Rearden-named entities was expressly iden-

---

[7]We further note that the District Court never mentioned the attorneys' oral argument statements in its subsequent summary judgment ruling, where it actually applied the "use in commerce" requirement.

tified in the credits of the movie "How to Make a Monster" as furnishing motion capture services. Significantly, this movie was aired on the cable television channel in 2001, several years before Rearden Commerce began using its own marks, and then was released as a DVD. Appellants also submitted to the District Court a copy of an "Office License Agreement," dated August 11, 2003, between "Rearden Studios, Inc." (as the licensor or landlord) and "Life Aquatic Productions, Inc." (as the licensee) (ER246-ER253). Turning to transactions that evidently took place after 2004, we uncover even more evidence of services rendered, including: (1) a July 10, 2006 "HD Editing Services Agreement" between "Electronic Arts" and "Rearden Studios LLC," in which Rearden Studios agreed to provide "Editorial services" in exchange for a fee of $2000 and expenses (ER216-ER221); (2) the 2005-2006 "Reel Directory," published in July 2005, which, inter alia, identified "Rearden Studios" (listed under the "Audio Post Facilities," "Video Post Facilities," "HD Post Facilities," and "Film Editing Facilities" categories) as a "State-of-the-art HDTV and audio editing studio" that "welcome[s] independent filmmakers and innovative projects" (FER2-FER10); (3) the cover of a DVD of a performance by Carlos Santana, bearing a copyright date of 2005 and identifying "Rearden Studios" as providing "DVD Design & Editorial" services (ER214); (4) "a true and correct copy of a photograph of the DVD cover of [Appellants'] 2005 project for independent filmmaker Catherine Margerin entitled "Hope," with "Rearden Studios" listed in the credits as providing editing services (ER178 (citing ER223)); and (5) "true and correct copies of a photograph of the DVD cover of [Appellants'] 2005 project for independent filmmaker Benjamin Morgan entitled 'Quality of Life' and an email stating that [Appellants'] logo would be included in the credits for the film" (ER178-ER179 (citing ER226-ER228)). We note that the District Court pointed to the Reel Directory entry as well as the agreement with Electronic Arts as evidence of "use in commerce."

[5] We therefore conclude that there are genuine issues of material fact with respect to the "services are rendered in

commerce" element. Turning to the other element of the "use in commerce" requirement, we have already addressed some of the evidence indicating that Appellants' "Rearden" marks and names were "used or displayed in the sale . . . of services" before 2005. Specifically, Appellants furnished incubation services to Ice Blink Studios in 2004, production services to Cinemax for the 2001 "How to Make a Monster" movie, and office space to Life Aquatic Productions in 2003. The Rearden mark is, moreover, featured in the contracts or credits associated with each of these transactions. Turning to non-sales activities, Appellants also appeared to generate a significant amount of publicity about their services and the "Rearden" marks and names, including: (1) numerous news stories in various trade and other publications (Perlman's amended declaration submitted with the first round of summary judgment motions referred to nineteen pre-2005 news stories, copies of which were attached to the declaration); (2) appearances at various trade shows and publicity parties (such as the 2000 launch party for Rearden Steel); and (3) the distribution of "Rearden" merchandise (ranging from such items as mugs and t-shirts bearing a "Rearden Steel" logo (identical to the registered "Rearden Studios" logo except with the word "Steel" in place of "Studios") to Nintendo Game Boy "invitations" distributed for the 2000 launch party, which were, inter alia, branded with the "Rearden Steel" logo and displayed graphics referring to "Rearden Steel").

[6] In the end, we do not believe that a reasonable finder of fact would be required to find in favor of Appellants with respect to the "use in commerce" requirement. In particular, we note that both Rearden Commerce as well as the District Court do raise some reasonable points in Rearden Commerce's favor. For instance, we have already mentioned the District Court's assertion that Appellants have only ever provided incubation services to Perlman himself and that no one has actually paid them to have their ideas incubated. Rearden Commerce further observes that Appellants did not file trademark applications for the "Rearden," "Rearden Companies,"

"Rearden Commerce Email," and "Rearden Personal Email" marks until May 2007. The District Court and Rearden Commerce likewise have noted that Perlman claimed under oath, in connection with the "Rearden Studios" trademark applications, that the "Rearden Studios" mark was not used until February 23, 2005 (and the District Court specifically noted that Appellants' attorney claimed at oral argument in connection with the second round of summary judgment motions that this mark was first used on this particular date); in contrast, Appellee had already changed its name from "Talaris" to "Rearden Commerce" as of January 2005.

**[7]** Nevertheless, this Court is not currently sitting as the finder of fact at this stage of the proceeding. We instead are confronted with motions for summary judgment implicating a highly fact-specific "totality of the circumstances" inquiry as well as the generally applicable requirement to view all of the evidence in the light most favorable to the non-moving party. Given the record now before us, we conclude that genuine issues of material fact preclude summary judgment in favor of Rearden Commerce on "use in commerce" grounds.

b.    "Likelihood of Confusion" and the *Sleekcraft* Factors

**[8]** The "likelihood of confusion" inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case. *See, e.g.*, *Entrepreneur*, 279 F.3d at 1140. To succeed, a plaintiff must show more than simply a possibility of such confusion. *See, e.g.*, *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987), *abrogated on other grounds by EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006).

Here, Appellants have essentially advanced a theory of unjust enrichment based on the purported confusion arising from Rearden Commerce's use of the "Rearden" name. *See,*

*e.g.*, *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968) (indicating that "the concept of unjust enrichment, utilized 'subject to the principles of equity', will properly serve to effectuate the policies of the Lanham Act"). In other words, their trademark claim rests on the notion that consumers could be more inclined to do business with Rearden Commerce because they mistakenly believe that its services are sponsored by or affiliated with Appellants. *See, e.g.*, *id.* at 122 ("The theory behind this modern advertising is that once the name or trade-mark of a product is firmly associated in the mind of the buying public with some desired characteristic- quality, social status, etc.- the public will buy that product."). If correct, Appellants could, among other things, lose an opportunity to charge for the use of their marks and names and also could suffer damage to their reputation or goodwill if Rearden Commerce's services turn out to be of poor quality. *See, e.g.*, *id.* (referring to possibility that customers who believed they are buying product manufactured by plaintiff may be so unhappy with product that they will never deal with plaintiff again and that, in any case, plaintiff also has right to exclusive use and control of product's reputation).

**[9]** Both the District Court and the parties themselves have turned to the eight "likelihood of confusion" factors first enumerated in our 1979 *Sleekcraft* opinion. These eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Sleekcraft*, 599 F.2d at 348-49.

It is well established that this multi-factor approach must be applied in a flexible fashion. The *Sleekcraft* factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist. *See, e.g.*, *Network*, 638 F.3d at 1145. In other words, "we do not count beans." *Dream-*

*werks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances. *See, e.g.*, *Network*, 638 F.3d at 1142, 1145, 1148-49, 1153-54; *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 F.3d 625, 631 (9th Cir. 2005). For example, this Court has pointed to three factors ("similarity of the marks," "proximity of the goods," and the simultaneous use of the Internet for marketing) as especially important in cases involving similar domain names. *See, e.g.*, *Network*, 638 F.3d at 1148-49. While the "internet trinity" is weighed heavily in domain cases, "it makes no sense to prioritize the same three factors for every type of potential online commercial activity." *Id.* at 1148-49. On the other hand, evidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a "likelihood of confusion" finding. *See, e.g.*, *Playboy*, 354 F.3d at 1026. "[T]he result of the consideration of one factor can influence the consideration of another." *Entrepreneur*, 279 F.3d at 1145 n.9. In the end, "[t]his eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." *Fortune*, 618 F.3d at 1030 (quoting *Brookfield*, 174 F.3d at 1054).

Given the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on "likelihood of confusion" grounds is generally disfavored. We have affirmed summary judgment rulings based on the *Sleekcraft* factors in the past. *See, e.g.*, *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006) ("[I]n cases where the evidence is clear and tilts heavily in favor of a likelihood of confusion, we have not hesitated to affirm summary judgment on this point." (citing *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004)); *Surfvivor*, 406 F.3d at 630-35. On the other hand, "[w]e have cautioned that district courts should grant summary judgment

motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901-02 (9th Cir. 2002) (citing *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001); *Interstellar*, 184 F.3d at 1109), *superseded by statute on other grounds*, Trademark Uniform Dilution Revision Act of 2006, 15 U.S.C. § 1125, *as recognized in Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158 (9th Cir. 2011). In other words, "[b]ecause the likelihood of confusion is often a fact-intensive inquiry, courts are generally reluctant to decide this issue at the summary judgment stage." *Au-Tomotive*, 457 F.3d at 1075 (citing *Thane*, 305 F.3d at 901-02)); *see also, e.g.*, *Fortune*, 618 F.3d at 1039.

Rearden Commerce defends the District Court's *Sleekcraft* analysis, specifically challenging Appellants' contention that the District Court merely tallied up the factors and applied them in an artificially mechanical fashion. The District Court certainly conducted a thorough and careful examination, and both the District Court as well as Rearden Commerce itself have raised some reasonable points in Rearden Commerce's favor. A reasonable jury could ultimately determine that several of the *Sleekcraft* factors weigh against Appellants (or, at least, do not support a finding of likelihood of confusion) and that, in the end, a verdict must be entered in favor of Rearden Commerce pursuant to the "likelihood of confusion" requirement. There, nevertheless, are genuine issues of material fact present in this case with respect to at least some of the *factors* as well as the overall *Sleekcraft* inquiry itself. The District Court acknowledged that two factors—namely the "strength of the mark" and "similarity of the marks" factors—weigh "somewhat" in favor of Appellants. Indeed, a reasonable jury could give great weight to these two factors, especially when viewed together. We also determine that there are genuine issues of material fact with respect to the "proximity of the goods," "evidence of actual confusion," "marketing channels

used," and "likelihood of expansion of the product lines" factors.

### i.  "Strength of the Mark" and "Similarity of the Marks"

The District Court recognized that the strength of a mark depends, at least in part, on where it falls on a spectrum ranging from the "arbitrary" to the "generic." *See, e.g.*, *Surfvivor*, 406 F.3d at 631-32. An arbitrary mark consists of "common words that have no connection with the actual product." *Id.* (citing *Dreamwerks*, 142 F.3d at 1130 n.7). On the other hand, the less protected "suggestive" category requires the exercise of some imagination to associate the mark with the good or service. *See, e.g.*, *id.* at 632.

The District Court properly characterized "Rearden" as a "suggestive" mark. Contrary to Appellants' claim that the mark is "arbitrary" in nature, it takes only a small exercise of imagination to associate this name, made famous in the business community (and elsewhere) as an image or paragon of entrepreneurial success by Rand's highly successful and influential novel, with the incubation of start-up enterprises:

> "[A]t a small distance of miles, the words of a neon sign stood written on the blackness of the sky: REARDEN STEEL. . . . [Hank Rearden] thought that in the darkness of this night other signs were lighted over the country: Rearden Ore—Rearden Coal—Rearden Limestone. He thought of the days behind him. He wished it were possible to light a neon sign above them, saying: Rearden Life."

*Rearden I*, 597 F. Supp. 2d at 1019 (alteration in original) (quoting Ayn Rand, *Atlas Shrugged* 37 (Signet 1992)).

The District Court also appropriately rejected Rearden Commerce's argument that Appellants' marks are especially

weak because over 840 other companies use the word "Rearden," or some variation thereof, in their respective names. Only four of these entities identify themselves as technology or engineering firms, and each of these four companies has headquarters outside of California, lacks an Internet presence, and employs fewer than five people. *See, e.g.*, *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087-88 (9th Cir. 2005) (indicating that district court properly excluded evidence of unrelated third party marks).

**[10]** According to the District Court, the "Rearden" mark is "relatively strong," and this *Sleekcraft* factor thereby weighs "somewhat in favor of finding a likelihood of confusion." *Rearden I*, 597 F. Supp. 2d at 1020. A reasonable finder of fact could accord more significant weight to this factor than did the District Court, particularly in light of evidence that Appellants have undertaken efforts to promote the mark in association with their services; we have observed that " 'advertising expenditures can transform a suggestive mark into a strong mark.' " *Fortune*, 618 F.3d at 1034 (quoting *Brookfield*, 174 F.3d at 1058); *see, e.g.*, *id.* at 1034-35 ("Here, Fortune proffered evidence indicating that it spends approximately $350,000 yearly marketing its footwear and that it sold 12,000,000 pairs of DELICIOUS shoes from 2005 to 2007. In addition, Fortune has advertised its DELICIOUS footwear in a variety of popular magazines . . . . Whatever its ultimate force, this evidence is sufficient to make the relative commercial strength of the DELICIOUS mark a question for the jury.").

Turning to the related "similarity of the marks" factor, the District Court appropriately looked to sight, sound, and meaning and recognized that any similarities weigh more heavily than differences. *See, e.g.*, *Sleekcraft*, 599 F.2d at 351. While it properly observed that no ordinarily prudent consumer could be confused by the parties' very different logos, it highlighted the apparent similarities between the names themselves. It therefore noted the prominence of the word

"Rearden" and the fact that, like "Rearden Commerce," many of Appellants' own names consist of just two words (excluding the corporate identifiers). The District Court also observed elsewhere in its initial summary judgment decision that Rearden Commerce has often referred to itself simply as "Rearden." *See, e.g.*, *Entrepreneur*, 279 F.3d at 1144 (stating that marks should be considered as they appear in marketplace). In the end, the District Court acknowledged that this factor weighs "somewhat" in favor of a "likelihood of confusion" finding. *Rearden I*, 597 F. Supp. 2d at 1023.

**[11]** A reasonable juror could conclude that the "strength of the marks" and "similarity of the marks" factors weigh more than just "somewhat" in favor of finding a likelihood of confusion. Granted, it is common for multiple companies offering different goods and services to use similar names and marks (the District Court provided as an example the fact that several well-known companies share the name "Johnson" (Johnson & Johnson, Johnson Publications, Howard Johnson's, Johnson Controls, Johnson Products, and S.C. Johnson)). However, a reasonable jury could still determine that this factor weighs significantly in Appellants' favor. We further note that the District Court did not address the possible cumulative effect of its determinations regarding the "strength of the mark" and "similarity of the marks" factors. *See, e.g.*, *Entrepreneur*, 279 F.3d at 1145 n.9 (stating inter alia that, "if the trademark holder's mark were strong, the fact that a consumer would likely notice the difference between two marks might not suffice for a finding that the marks are dissimilar").

### ii.   "Proximity of the Goods"

Initially, Appellants are correct that they need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor. Related goods (or services) are those " 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.' " *Sleekcraft*, 599 F.2d at 348 n.10 (citations omitted). As the

District Court noted, the mere existence of some similarity does not necessarily "render the businesses so closely related as to suggest strongly a likelihood of confusion." *Entrepreneur*, 279 F.3d at 1148. However, we have also adopted a rather flexible approach to the whole notion of competition. For instance, this Court concluded that two entities "are not properly characterized as non-competitors" where "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show." *Brookfield*, 174 F.3d at 1056 (citations omitted); *see also, e.g., Dreamwerks*, 142 F.3d at 1129-32 (indicating that finder of fact could find proximity where plaintiff sponsored science fiction conventions and defendant was well-known movie studio because, among other things, consumers could easily suspect that studio sponsored conventions at which its merchandise was sold); *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (stating that, "[a]lthough the parties are not direct competitors," their respective financial services "may be sufficiently 'complementary' or 'related' that the public is likely to be confused as to the source of the services" (citations omitted)).

**[12]** Turning to the underlying record, Appellants quite properly cite to evidence that could support a finding that the services offered by the parties "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10 (citations omitted). Construed in the light most favorable to Appellants, the record contains evidence suggesting that the parties have, among other things: (1) offered arguably similar technology platforms to their respective customers (i.e., Appellants have offered an online means, as part of their incubation business, for clients to arrange business, travel, and other services through TriNet while, on the other hand, Rearden Commerce has provided businesses with an online marketplace for businesses to purchase and manage similar

services from a variety of third parties);**⁸** (2) attended the same trade shows; (3) appeared in the same publications; and (4) relied on private investment funding from the same sources.

**[13]** We acknowledge that a reasonable jury could still rule against Appellants with respect to the "proximity of the goods" factor for the various reasons singled out by the District Court as well as Rearden Commerce. For instance, a reasonable finder of fact could possibly determine that an incubator cannot really be compared to an online business concierge marketplace. Nevertheless, after viewing the evidence in the light most favorable to the non-moving parties, we are satisfied that there are genuine issues of material fact with respect to this factor.

### iii.    "Evidence of Actual Confusion"

With respect to the "evidence of actual confusion" factor, Appellants claim that the District Court committed reversible error by refusing to take into account evidence of non-consumer confusion in the present context. While we reject their theory of so-called "non-purchasing consumers," we ultimately agree that the District Court should have taken into account evidence of relevant non-consumer confusion in its analysis and that, taking such evidence into consideration, there are genuine issues of material fact with respect to this particular factor.

**[14]** It is well established that the particular field or market in which trademark protection is being sought must be taken into account. *See, e.g.*, *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010). Purportedly

---

**⁸**There is some indication that Appellants' efforts in this area have centered on developing IT infrastructure underlying a platform, application, or website managed by TriNet. In this respect, the services offered by Rearden Commerce may be more similar to those offered by TriNet rather than by Appellants.

relying on this principle, Appellants argue that they have offered "incubation, technology development, and production services to a variety of companies spanning across a range of industries." (Appellants' Brief at 24 (citing ER612-ER615).) Appellants emphasize that incubation services, by definition, are not directed towards the general public and that the incubation business cannot be compared to more traditional businesses offering goods and services to end purchasers. For instance, start-up ventures typically deal with investors, other businesses seeking strategic partnerships, marketers, and general business strategists. Various outlets, like trade shows and trade publications, are therefore critical to a successful incubation process as well as to a successful incubation business. According to Appellants, these various groups (i.e., investors, businesses seeking strategic partnerships, marketers, strategists, vendors, suppliers, and media outlets) represent the "relevant consuming groups" or the "non-purchasing consumers" for purposes of their current trademark claim. In other words, they assert that an incubator essentially "sells" the start-up venture itself to investors and other interested parties.

We do not accept Appellants' open-ended and unsupported theory of "non-purchasing consumers." As Rearden Commerce points out, their "incubator" model is distinct from their more traditional movie production and property management services. Appellants also embrace an overly expansive understanding of the relevant market. It is difficult to see who exactly could not be included as a "non-purchasing consumer" under their interpretation of this concept, which apparently includes those who sell to, as well as buy from, the entity. They cite to no case law or relevant authority expressly recognizing such an open-ended concept. On the contrary, they actually acknowledge that "[t]he relevant group for showing confusion is the 'consuming public' for the particular good or service—that is, consumers who are actually in the market for the good or service at issue." (Appellants' Brief at 23 (citing *Thane*, 305 F.3d at 903.) Just as the relevant consumer in a case involving a website selling luxury cars is a

reasonably prudent person accustomed to shopping online, *see Toyota*, 610 F.3d at 1176, the relevant consumer for purposes of an incubation business is the start-up enterprise that hires (and pays) the incubator for its various services.

**[15]** We also recognize that a court conducting a trademark analysis should focus its attention on the relevant consuming public. " 'The test for likelihood of confusion is whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.' " *Entrepreneur*, 279 F.3d at 1140 (quoting *Dreamwerks*, 142 F.3d at 1129). Accordingly, " '[t]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally.' " *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (emphasis omitted) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582-83 (2d Cir. 1991)); *accord Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 & n.5 (9th Cir. 1989) (explaining that "likelihood of confusion" analysis must remain focused "upon confusion in the marketplace, as opposed to generalized public confusion," and that "[u]nless prospective purchasers of AII 's goods are confused, there is . . . no cause of action"). In the end, "consumer confusion" constitutes "the *sine qua non* of trademark infringement." *Entrepreneur*, 279 F.3d at 1142; *see also id.* at 1149 (same); *id.* at 1154 (describing consumer confusion as "linchpin" of trademark infringement).

**[16]** Consistent with this principle, litigants usually satisfy the "likelihood of confusion" test by providing direct evidence of consumer confusion. Nevertheless, we conclude that non-consumer confusion may also be relevant to the "likelihood of confusion" inquiry in three specific and overlapping circumstances—namely where there is confusion on the part of: (1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers. In all three instances, the non-consumer

confusion bears a relationship to the existence of confusion on the part of consumers themselves.[9]

Our recognition that non-consumer confusion can properly factor into the "likelihood of confusion" inquiry is consistent with circuit precedent. In *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625 (9th Cir. 2005), we stated that, "[i]n analyzing this ["evidence of actual confusion" *Sleekcraft*] factor, we may consider whether merchants and non-purchasing members of the public, as well as actual consumers, were confused," *id.* at 633 (citing *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992); *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 854 (9th Cir. 2002)). Likewise, in *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848 (9th Cir. 2002), we relied in part on a Federal Circuit opinion, which noted that the 1962 amendments to the Lanham Act eliminated language limiting the statute's scope to confusion on the part of purchasers and went on to hold that an action can be based on the confusion of non-purchasers such as individuals who simply observe the purchaser wearing an accused article of clothing, *id.* at 854 (discussing *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985 (Fed. Cir. 1993)). We now explain our bases for concluding that non-consumer con-

---

[9]We need not—and do not—decide whether there are other circumstances or grounds for taking into account non-consumer confusion. For example, we do not decide whether confusion on the part of such non-consumers as vendors and suppliers, potential employees, and investors should be considered merely because such confusion could affect the trademark holder's business, goodwill, or reputation. *See, e.g.*, *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10-11, 15-18 (1st Cir. 2004) (holding, inter alia, that "likelihood of confusion" inquiry is not limited to actual or potential purchasers but also encompasses other persons whose confusion could either influence purchasing decisions or, alternatively, present significant risk to trademark owner's sales, goodwill, or reputation). We simply recognize that the confusion of vendors, suppliers, potential employees, investors, and similar groups of non-consumers could be relevant on the three specific grounds set forth in this opinion.

fusion can be relevant to the "likelihood of confusion" inquiry in the aforementioned three circumstances.

As an initial matter, it is well established that confusion on the part of potential consumers may be relevant. In *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531 (9th Cir. 1989), for example, we acknowledged that the "likelihood of confusion" inquiry must remain focused on confusion on the part of "prospective purchasers," *id.* at 1535 & n.5. "The critical focus of the likelihood of confusion inquiry," we concluded in that case (which was cited by the District Court), is "the effect of defendant's usage of the name on prospective purchasers in the marketplace." *Id.* at 1535 (citing *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444-45 (9th Cir. 1980); *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 386 (S.D.N.Y. 1985); *Sears, Roebuck & Co. v. Sears Fin. Network, Inc.*, 576 F. Supp. 857, 861 (D.D.C. 1983)).

We have also recognized, in a closely related context, that non-consumer confusion can serve as a proxy for consumer confusion. Our recent decision in *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011), involved plaintiff companies who sold traffic school and driver's education courses, *id.* at 828. The plaintiffs brought Lanham Act claims for unfair competition and false advertising against the defendants, who owned DMV.org, a for-profit website offering services in "renewing driver's licenses, buying car insurance, viewing driving records, beating traffic tickets, registering vehicles, [and] even finding DUI/DWI attorneys." *Id.* In assessing whether the defendants' website was "likely to mislead consumers into thinking DMV.org was affiliated with a government agency," *id.* at 827, we acknowledged not only evidence of "actual consumer confusion," *id.* at 828, but also confusion on the part of non-consumers like law enforcement officials and state DMV employees, *id.* Implicit in our attention to the non-consumer evidence was the following reasoning: if even these parties, who presumably have much more

familiarity with governmental DMVs, are confused about the defendants' website, then it is probable that consumers, who have less familiarity, would also experience confusion. We note that the degree to which non-consumer confusion can serve as a proxy for consumer confusion depends on how the groups are situated in relation to one another. For example, whereas confusion on the part of a sophisticated non-consumer may reasonably signal that less sophisticated consumers would also be confused, confusion on the part of a non-sophisticated non-consumer may shed little or no light on whether a sophisticated consumer would likewise be confused.

In addition, our prior decisions support the proposition that non-consumer confusion can bear on the "likelihood of confusion" inquiry insofar as non-consumer confusion can contribute to consumer confusion. In *Storz*, we discussed the concept of "post-purchase confusion." We explained that "[t]he law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.,* confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Storz*, 285 F.3d at 854 (citing *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980)). Ultimately, the Court in *Storz* determined that there were genuine issues of material fact as to "likelihood of confusion" because the record contained, among other things, evidence indicating confusion on the part of the surgeons who actually handled the endoscopes at issue in the case (which were extensively reconstructed at the hospitals' orders by the defendant and yet still bore the plaintiff manufacturer's own mark) and who then could influence their hospitals' purchasing decisions. *Id.* at 855; *see also, e.g.*, *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) (observing that plaintiff raised genuine issue of material fact as to actual confusion when, in addition to submitting letter from confused

customer, it proffered testimony "that retailers were confused about the source of [the parties' stuffed] bears"); *Sleekcraft*, 599 F.2d at 352 (asserting that "confusion among retailers and consumers is relevant").

Recognizing the potential relevance of non-consumer confusion accords with this Circuit's precedent, which reflects a flexible approach to assessing "likelihood of confusion," as embodied in the highly fact-specific *Sleekcraft* analysis. In addition, it appears to be a matter of basic common sense to recognize the very real possibility that confusion on the part of at least certain non-consumers could either: (1) turn into actual consumer confusion (i.e., potential consumers); (2) serve as an adequate proxy or substitute for evidence of actual consumer confusion (i.e., non-consumers whose confusion could create an inference of consumer confusion); or (3) otherwise contribute to confusion on the part of the consumers themselves (i.e., non-consumers whose confusion could influence consumer perceptions and decision-making).

As Appellants further point out, such an approach appears to be consistent with rulings from other courts.[10] They also

---

[10]See, e.g., *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006) ("'Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.' *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10 (1st Cir. 2004). Here, viewing the evidence most favorably to MQVP, as we must, Mid-State engaged in the unauthorized use of the MQVP® mark for the obvious purpose of confusing, indeed deceiving, end users into believing they are buying qualified 'MQVP parts' that are fully validated under the MQVP program, with all its attendant services. The deception, if successful, would discourage competing vendors from paying MQVP to participate in the full program, thereby destroying the market for the very basket of services the MQVP® mark was intended to protect."); *Beacon*, 376 F.3d at 9-11, 15-18 (holding, inter alia, that "likelihood of confusion" inquiry is not limited to actual or potential purchasers but also encompasses other persons whose confusion could influence purchasing decisions or could present significant risk to

appropriately note that a leading trademark law treatise observed that "[d]amage to reputation and good will can be triggered by confusion among non-purchasers" and that "actionable confusion need not be limited to potential purchasers whose confusion could cause a direct loss of sales." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5 (4th ed. 2010).

We now turn to the evidence of consumer and non-consumer confusion presented by Appellants. We begin with

trademark owner's sales, goodwill, or reputation and determining that finder of fact could infer that misdirected communications demonstrated confusion among companies purchasing parties' insurance policies, their covered employees, consulting physicians and other health care providers, third-party insurers, attorneys for claimant employees, and courts handling such claims); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382-83 (2d Cir. 1997) ("The likelihood of confusion test concerns not only potential purchasers but also the general public. *See United States v. Hon*, 904 F.2d 803, 804-08 (2d Cir. 1990) (discussing Rolex watches and other luxury goods). But, such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer. [Restatement (Third) of Unfair Competition § 20 cmt. b (1995).] Here, where there is no showing that the general public is aware of Landscape's 'dress,' the district court erred in giving this factor great weight."); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.* 78 F.3d 1111, 1119-20 (6th Cir. 1996) (stating that district court erred in rejecting incidents of confusion on part of vendors and other non-consumers simply because they were not direct consumers of plaintiff golf club's services and indicating, inter alia, that confused persons were knowledgeable about golf clubs and had incentive to identify club in question but nevertheless were still unclear about which club was which); *Bishop v. Hanenburg*, 695 P.2d 607, 611 (Wash. Ct. App. 1985) ("Not only is a supplier a member of the public, but if a supplier is confused by similar businesses with identical names, the consuming public is likely to be similarly confused.").

Several of these cases suggest that non-consumer confusion may be relevant independent of any relationship to confusion on the part of consumers. We cite these decisions only to show that other courts have adopted an expansive approach to the question of non-consumer confusion. As we have already noted in footnote 9, supra, we need not—and do not—decide whether there are other circumstances or grounds for taking non-consumer confusion into account.

the evidence of actual consumer confusion. As the District Court recognized, two incidents "involve actual confusion on the part of a member of the relevant consuming public." *Rearden I*, 597 F. Supp. 2d at 1023-24. We therefore are confronted with at least some direct examples of confusion on the part of consumers. In the first, a customer of Rearden Commerce, QubicaAMF, expressed confusion as to which "Rearden" it was conducting business with after receiving a subpoena in this lawsuit. In addition, Appellants received dozens of misdirected e-mails actually intended for Rearden Commerce, some of which were sent by Rearden Commerce's own customers.

[17] Turning to the non-consumer evidence in the record, Appellants specifically note that trade and other publications, as well as trade show organizers and attendees, have confused Appellants with Rearden Commerce or have believed that Rearden Commerce was founded by Perlman or somehow is associated with him and the various Rearden companies. For example, the author of a March 23, 2005 CNET News.com article observed that "the main question in the conference hallways [at the PC Forum trade show] was whether the company [Rearden Commerce] had any relationship to Rearden Steel, the set-top box outfit started years ago by WebTV founder Steve Perlman" and that, "[i]t doesn't, but the association made many wiggly." (ER825.) In addition, the author of a May 6, 2008 TechConfidential article, discussing the receipt of $100 million in funding by Rearden Commerce, clearly believed that this company was created by the "legendary inventor," Perlman, and the "technology incubator" he founded. (ER895.) This article also featured an excerpt from a recent interview with Perlman and included his picture. A Rearden Commerce employee likewise admitted in his deposition testimony that he was asked about "a dozen times" on the first day of the April 2008 Web 2.0 show whether the companies were somehow affiliated or related. (ER439.)

[18] Confusion on the part of such persons could conceivably fall under any of the non-consumer confusion categories

set forth above. In particular, it appears that the confusion of presumably knowledgeable and experienced trade journalists and trade show organizers could very well influence the purchasing decisions of consumers.

Appellants further point, inter alia, to evidence of actual confusion on the part of other non-consumers, evidently either in a position in which to influence consumers or to serve as their proxy. These non-consumers include: (1) Appellants' prospective employees; (2) a vendor; (3) an investor (MacQuarie Group, which had previously entered into an agreement with Rearden Commerce itself and was then in negotiations with Appellants regarding a $1 billion lease); (4) Appellants' auditors; and (5) their patent attorneys. Tellingly, Rearden Commerce and Grady were cautioned about using the "Rearden" name before the company's name was ultimately changed in 2005. For example, Rearden Commerce's public relations consultant stated in a December 8, 2004 e-mail that: "Also, there is a guy who has a small thing called Rearden Steel, the one who started Web TV. That might confuse folks in the beginning." (ER338.)

In the end, a reasonable finder of fact could still find in favor of Rearden Commerce. In particular, it is certainly conceivable that such a finder of fact could determine that the evidence of non-consumer confusion presented by Appellants simply has no bearing on the critical question of whether consumers themselves may be confused. For instance, a reasonable jury could find that presumably sophisticated start-ups looking for critical incubation services could not really be misled by some mistakes in a trade publication. Both the District Court as well as Rearden Commerce likewise have presented a variety of reasons for weighing this factor in favor of Rearden Commerce. Among other things, they have asserted that the evidence of confusion presented here merely relates to the parties' names (and e-mail addresses), not to the trademarks that include the logos. In fact, Rearden Commerce suggests that Appellants attempted to fabricate the appearance

of confusion in various underhanded ways (i.e., removing e-mail filters and moving their booth at the Web 2.0 show).

**[19]** Still, we believe that there are genuine issues of material fact present with respect to the "evidence of actual confusion" factor, especially after viewing the evidence in the light most favorable to Appellants. If anything, Rearden Commerce's accusations of bad faith only further highlight the existence of such genuine factual issues and the need for a jury to make the ultimate factual determinations in this proceeding.

### iv.  The Remaining *Sleekcraft* Factors

**[20]** Although they do appear to be of lesser importance given the current record now before us, an examination of the remaining four factors provides a limited degree of support for Appellants' position on appeal.

On the one hand, the last two factors ("type of goods and the degree of care likely to be exercised by the purchaser" and "defendant's intent in selecting the mark") do not appear to weigh in favor of finding a likelihood of confusion. Among other things, Appellants address these two specific factors in a cursory fashion and specifically admit that we are confronted in this case with sophisticated consumers.

On the other hand, we agree with Appellants that there are genuine issues of material fact with respect to the "marketing channels used" factor due to the evidence in the record indicating that the parties have appeared in the same trade publications and have participated in the same trade shows. There are also genuine issues of material fact with respect to the "likelihood of expansion of the product lines" factor. According to Perlman, "Rearden has been developing wireless technology since 1999" and "has continued with extensive wireless development work resulting in dozens of patents pending and issued, which will be leading to revolutionary

wireless and mobile products." (ER629.) In turn, Rearden Commerce has, among other things, developed its own "mobile wireless product" (Appellee's Brief at 41), registered the "ReardenMobile.com" and "MobileRearden.com" domain names, and appears to have an active interest in further expansion. In the end, it is for the jury to decide whether the parties really intend to expand into—or are already operating in—the same product line or lines.

**[21]** In sum, because there are genuine issues of material fact with respect to both the "use in commerce" and "likelihood of confusion" elements of Appellants' Lanham Act trademark claim, the District Court erred in granting summary judgment to Rearden Commerce. We now turn to their other federal claim: the cybersquatting cause of action under the ACPA statute.

2.   The ACPA and "Bad Faith"

A plaintiff pursuing a cybersquatting claim under the ACPA must show that: "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.' " *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010) (footnote omitted). This appeal implicates the first and third elements of the ACPA cause of action for cybersquatting: whether the plaintiff possesses a protected mark; and whether the defendant acted with a bad faith intent to profit. *See, e.g.*, 15 U.S.C. § 1125(d)(1)(A); *DSPT*, 624 F.3d at 1218-19.

We have already determined (in Section III.A.1.a, *supra*) that there are genuine issues of material fact with respect to the Appellants' "use in commerce" of the "Rearden" marks and names. The District Court recognized that a reasonable jury could, however, find that Appellants used in commerce the "Rearden Studios" mark as of this date, and it therefore

refused to grant summary judgment in Rearden Commerce's favor based on the "use in commerce" requirement with respect to the domain names registered after July 2005 ("ReardenLLC.com," "ReardenLLC.net," "ReardenMobile.com," "MobileRearden.com," and possibly "ReardenC.com"). Appellants themselves focus on these post-July 2005 domain names—especially "ReardenLLC.com" and "ReardenLLC.net."

As to bad faith, the notion implicates three analyses: (1) surveying the nine non-exclusive and permissive statutory factors that "may" be considered in "determining whether a person has a bad faith intent," 15 U.S.C. § 1125(d)(1)(B)(i); (2) taking into account the unique circumstances of each case, which represent " 'the most important grounds for finding bad faith,' " and which affect the examination (and weight) of the nine permissive factors as well as any other relevant considerations, *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.* 304 F.3d 936, 946 (9th Cir. 2002)); and (3) considering the availability of the safe harbor for any defendant who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful," 15 U.S.C. § 1125(d)(1)(B)(ii). Applying this framework, we determine that there are genuine issues of material fact with respect to the matter of bad faith.

Beginning with the statutory factors, the District Court recognized that the second factor (the extent to which the domain name consists of the alleged cybersquatter's legal name or a name commonly used to identify the cybersquatter) "marginally favors" Appellants, at least as to the "ReardenLLC" domain names, because Rearden Commerce admitted that it has never used the term "Rearden LLC" to describe itself. *Rearden II*, 2010 WL 2650516, at *6. We add that a reasonable jury could weigh this particular factor even more heavily in favor of Appellants given the fact that "Rearden LLC" is

the exact legal name recently adopted by one of the Appellants.

Furthermore, Rearden Commerce's own General Counsel "ordered these domains be purchased immediately after learning that Rearden might oppose RC's trademark applications." *Id.* at *9. Specifically, General Counsel Sandoval and Appellants' outside counsel had been exchanging e-mails—all with the subject line "Rearden LLC"—about, among other things, Appellants' possible opposition to Rearden Commerce's trademark applications. At the same time, Grady had asked Perlman whether the "Rearden.com" domain name was for sale and had received a negative response. On the same day it agreed to an extension of time for Appellants to oppose its trademark applications, Rearden Commerce, at Sandoval's own direction, registered the "ReardenLLC.com" domain name (and the company obtained the "ReardenLLC.net" name shortly thereafter). Explaining this conduct, Sandoval testified, inter alia, that: "So, yes, at that point in time, there was I find out that there's a party opposing my trademark application that I feel has no right to oppose my trademark application, and I need to protect my mark, and I need to—and those were two marks that I hadn't obtained in the past." (ER310-ER311 (emphasis added).) He also admitted that he was well aware of the fact that one of the Perlman entities was organized as a limited liability company.

**[22]** The District Court (and Rearden Commerce) are correct that a reasonable jury could find that Rearden Commerce had not earlier considered these two particular domain names during its initial registration frenzy, registered them when it became aware of the names, and did so as part of a long-standing (if unwritten and informal) branding program. However, it is improper for a court to grant a party's summary judgment motion merely because the finder of fact could find in its favor. On the contrary, a reasonable finder of fact could, among other things, find that Rearden Commerce acted in bad faith by seeking to gain leverage in an ongoing trademark dis-

pute, especially given the apparent absence of any formal policy or method for its registrations. *See, e.g.*, *DSPT*, 624 F.3d at 1218-21 (stating that registration or use of domain name in order to obtain leverage in business dispute could be sufficient to establish bad faith).

**[23]** Likewise, there are genuine issues of material fact with respect to Rearden Commerce's alleged good or bad faith in dealing with Appellants after they first accused the company of cybersquatting. As Appellants acknowledge, Rearden Commerce did deactivate the "ReardenLLC.com" and "ReardenLLC.net" domain names when confronted by Appellants. At oral argument on the cybersquatting claims, Rearden Commerce (although, as Appellants point out, at the District Court's prompting) made an unconditional offer to transfer the two domain names to Appellants. However, we disagree that such conduct "conclusively demonstrates," *Rearden II* 2010 WL 2650516, at *10, Rearden Commerce's good faith. Given the overall factual record present in this case, this is a question for the jury to decide. We note, for example, that Rearden Commerce had previously offered to maintain the non-directing nature of the domain names only on the condition that Appellants abandon several trademark applications. The District Court did draw a distinction between attempting to sell a domain name before litigation commences and doing so in the context of litigation itself. But, at the very least, the evidence in the record still presents genuine factual issues with respect to the existence of bad—or good—faith. *See, e.g.*, *DSPT*, 624 F.3d at 1218-21.

B.   State Law Claims

**[24]** It is undisputed that Appellants' state law trademark infringement claim (as well as their claim under the UCL to the extent it is based on infringement grounds) is subject to the same legal standards as their Lanham Act trademark claim. *See, e.g.*, *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). Therefore, to the extent that there are

genuine issues of material fact with respect to the federal trademark claim, such issues also exist as to the related state trademark infringement and unfair competition claims. Likewise, we conclude that Rearden Commerce is not entitled to summary judgment on the UCL claim insofar as this state law claim is based on allegations of cybersquatting.

## IV.

For the foregoing reasons, we vacate the District Court's orders granting summary judgment in favor of Rearden Commerce and remand for further proceedings consistent with our opinion.

**VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**